Lars **EHRLANDER**, Appellant,

v.

**STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellee.**

Nos. S–3129, S–3361 and S–3383.

Supreme Court of Alaska.

Aug. 24, 1990.

Rehearing Granted Oct. 25, 1990.

---

**630**

William R. Satterberg, Jr., Robert John, Law Offices of William R. Satterberg, Jr., Fairbanks, for appellant.

Gary W. Vancil, Law Offices of Gary W. Vancil, P.C., Fairbanks, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Chief Justice.

INTRODUCTION

This case arises out of the denial of a request to subdivide real property located in Fairbanks. The owner of the property, appellant Lars Ehrlander, seeks inverse

condemnation against the State of Alaska Department of Transportation (DOT). The trial court entered summary judgment in favor of DOT.

FACTS AND PROCEEDINGS

Ehrlander, a real estate developer, purchased unimproved property zoned by the Fairbanks North Star Borough for high-density housing. When he purchased it, he knew that part of the property lay within a corridor in which DOT was contemplating construction of an extension of Geist Road, but he believed that he would be able to subdivide the entire property because DOT told him that it would not object to the property being subdivided.

In August 1983, Ehrlander submitted his subdivision request to the borough platting board. DOT submitted a statement that it had no objection to the subdivision and noted DOT hoped to have "location approval" for Geist Road by "next winter." DOT also sent in a copy of Ehrlander's subdivision map on which the possible highway routes were marked in red.

On August 24, 1983, Ehrlander's application to the platting board for preliminary approval of the subdivision was denied in part and granted in part.[1] That which was granted lay north of the northernmost red line on the DOT map. Denial was based on the hope that DOT would soon decide precisely where to place the extension. The next day, one board member decided Ehrlander's proposal should be reconsidered and a second hearing was scheduled for September 14.

Prior to reconsideration, DOT sent three letters to the platting board. The first stated that "[e]ven though there is a degree of uncertainty in the route location, we feel comfortable with designating the red line as a northern limit." It also reiterated that DOT expected to "have a firm decision on the project [location] in January, 1984." The second letter noted that DOT "could be ready to begin" acquiring the land in the highway's path "by the fall of 1984." DOT noted that ordinarily the design for the roadway might not have been completed for two to four years. However, "because of the impending development in this area[,] the Department would likely pursue the speedier [advanced acquisition] process," but this would require approval from the Federal Highway Administration. In the third letter, DOT communicated its approval of the board's prior action:

> Recommend phased development such that the first phase be allowed north of the proposed Geist Road Extension alternatives as shown on attached map (red line). Second phase development could take place after location approval is acquired, or Summer 1984, whichever is first.

> If the developer does not agree to phased development, we would like to suggest that a note be placed on the plat describing the potential Geist Road Extension alignment through the lots affected and the date of location approval (Summer 1984).

On reconsideration, the board affirmed its prior decision and suggested that Ehrlander return in the spring of 1984 when the progress of the highway project could be re-evaluated and more of his property might be subdivided. Final platting board action took place in October 1983. Ehrlander did not appeal.

Later that fall, DOT, in cooperation with the borough, initiated the highway location process. Although the record does not disclose the outcome of those hearings, Ehrlander submitted a second application during the summer of 1984 requesting subdivision of a small additional portion adjacent to that portion which was already platted.[2] In a letter dated September 19, 1984, DOT informed Ehrlander's agent that it "[did] not see any conflict between the addition and the proposed Geist Road Extension." The letter noted that the "precise location has not been determined" but concluded that DOT "[did] not foresee any circum-

---

1. *See* Appendix. The subdivision of sections A and B was denied. Approval was granted for the northerly portion of the tract.

2. *See* Appendix. This is section A of the appendix.

stance that would cause a shift to the north of the location shown on your plat." The new plat was approved by the borough on October 24, 1984.[3]

The state received location approval from the Federal Highway Administration on July 31, 1985. The state instituted condemnation proceedings on April 29, 1986. At that time, Ehrlander, who allegedly had been unable to develop or sell the unsubdivided property, filed an action for inverse condemnation against the borough and DOT.

The actions were consolidated by Judge Blair. Ehrlander was granted partial summary judgment which declared that a taking occurred when the borough denied, in part, his subdivision request. Left open were the questions whether the borough, or DOT, or both were responsible for the taking, and the amount of damages. Judge Blair rejected defendants' argument that Ehrlander had failed to exhaust his administrative remedies when he did not appeal the borough's decision not to allow all of the property to be subdivided.

By stipulation, the condemnation action was severed from the inverse condemnation claim. The condemnation claim was to be tried first. The court ruled that in the inverse condemnation claim damages would run from August 24, 1983 (the date of the partial subdivision denial) to April 29, 1986 (the date DOT's condemnation action was brought).

At the condemnation trial, DOT contended that the property was worth $1.79 per square foot, for a total of $524,000. The jury awarded this amount.[4] By contrast, Ehrlander argued that the property should have been valued between $4.50 and $4.95

per square foot. Ehrlander did not appeal the verdict in the condemnation case.

Ehrlander settled his inverse condemnation claim with the borough. Shortly thereafter, Judge Steinkruger,[5] relying principally upon *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119, 121–22 (Alaska 1988), granted DOT summary judgment because Ehrlander had not exhausted his administrative remedies since he had not appealed the borough's refusal to approve the subdivision as to part of his property. The trial court reasoned primarily that had Ehrlander appealed the refusal, the borough planning commission might have approved the request and thereby eliminated any damage.[6] Following this, the inverse condemnation action was dismissed. Ehrlander appeals.

## DISCUSSION

### I.

Ehrlander bases his claims on the theory of inverse condemnation. Inverse condemnation in its classic form entails a physical invasion of private property by government without formally exercising the power of eminent domain. 3 *Nichols' The Law of Eminent Domain* § 8.1[4] (1971); *State, Dept. of Highways v. Crosby*, 410 P.2d 724, 728, 729 (Alaska 1966); *Wickwire v. City and Borough of Juneau*, 557 P.2d 783, 784 (Alaska 1976). This is not such a case as there was no physical invasion by the state until the condemnation action was filed. Instead, Ehrlander claims that DOT through a series of actions effectively denied him the benefits of ownership of his property.

Recently, in *Homeward Bound, Inc. v. Anchorage School District*, 791 P.2d 610 (Alaska 1990), we acknowledged that an

3. Ehrlander claims a temporary taking of this portion.

4. The jury also awarded severance damages of $147,870.

5. The case was assigned to Judge Steinkruger after Judge Blair left the bench.

6. The trial court stated in part:
   Had the plaintiff filed an appeal to the Planning Commission with both the constitutional and non-constitutional issues which he

has raised before this court with regard to claims against the Fairbanks North Star Borough and the State of Alaska....
   As in *Lomond,* the successful pursuit of this claim through administrative process could have obviated the need for judicial review. Furthermore, such a review would have completed the factual context for judicial review, if necessary. These benefits justify application of the exhaustion doctrine of *Lomond* to the instant case.

action for inverse condemnation might lie where a land use planning classification deprives a private property owner "of the economic advantages of ownership of the property." *Id.* at 614. Other jurisdictions have also recognized that a regulation or land use decision may give rise to an inverse condemnation action.[7]

▆▆▆ Article 1, section 18 of the Alaska Constitution provides: "Private property shall not be taken or damaged for public use without just compensation." This clause is to be interpreted liberally in favor of the property owner. *State v. Doyle,* 735 P.2d 733 (Alaska 1987). The inclusion of the term "damage" affords the property owner broader protection than that conferred by the Fifth Amendment to the Federal Constitution. *Id.* The objective of just compensation is to place the property owner "as fully as possible in the same position as he was in prior to the taking of his property." *Ketchikan Cold Storage Co. v. State,* 491 P.2d 143, 150 (Alaska 1971). These principles are applicable not only to ordinary eminent domain proceedings, but to actions in inverse condemnation. *Doyle,* 735 P.2d at 733.

## II.

▆▆▆ Ehrlander's first point on appeal is that the court erred in dismissing his complaint on the grounds of failure to exhaust administrative remedies because he had claims which were not based on the action of the platting board. Ehrlander claims that DOT delayed unreasonably in bringing the condemnation proceedings after it announced its intention to utilize Ehrlander's property for the highway expansion and

that this amounts to an imputed taking.[8] Alternatively, Ehrlander argues that even if there were no imputed taking, DOT acted unreasonably prior to instituting the condemnation action, causing a decline in the value of his property, and that he is entitled to damages for the decline.[9]

In response, DOT argues, first, that Ehrlander did not raise these theories in opposition to the state's motion for summary judgment. This argument is incorrect with respect to Ehrlander's first theory, that DOT's delay amounted to an imputed taking. This theory was raised and argued in Ehrlander's opposition to DOT's motion for summary judgment filed July 1, 1988, which was incorporated by reference in his opposition to the state's motion which was granted by Judge Steinkruger. However, Ehrlander's theory that he is entitled to damages for unreasonable conduct by DOT which fell short of a taking, but depressed the value of Ehrlander's property, was not raised in opposition to DOT's motion for summary judgment. It is thus waived, and we will not consider it.[10]

DOT's second argument is that Ehrlander did not raise a prima facie case of state delay of such magnitude as to amount to an imputed taking. "Absent extraordinary delay or a bad faith motive to depress land prices, the state's project planning and acquisition activities cannot result in a taking."

In general, the cases cited by Ehrlander in support of the imputed taking theory[11] involve conduct on the part of the condemning authority which was designed to prevent development of the property in ques-

**7.** *See* 3 *Nichols' The Law of Eminent Domain* § 8.1[4] (1989); 7A *Nichols, supra,* § 14.03.

**8.** In support of this theory, Ehrlander cites *Roth v. State Highway Commission,* 688 S.W.2d 775, 777 (Mo.App.1984); *City of Los Angeles v. Tilem,* 142 Cal.App.3d 694, 191 Cal.Rptr. 229, 234 (1983); *Taper v. City of Long Beach,* 129 Cal. App.3d 590, 181 Cal.Rptr. 169, 180 (1982); *Lange v. State,* 86 Wash.2d 585, 547 P.2d 282, 287 (1976); *Drakes Bay Land Company v. United States,* 191 Ct.Cl. 389, 401, 424 F.2d 574, 586 (1970); *Benesen v. United States,* 212 Ct.Cl. 375, 385, 548 F.2d 939, 947 (1977); *Washington Market Enterprises v. City of Trenton,* 68 N.J. 107,

343 A.2d 408, 410 (1975); *Foster v. City of Detroit,* 254 F.Supp. 655 (E.D.Mich.1966) *aff'd* 405 F.2d 138; *Conroy–Prugh Glass Co. v. Commonwealth Dept. of Transp.,* 456 Pa. 384, 321 A.2d 598, 602 (1974).

**9.** In support of this theory, Ehrlander cites *Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972).

**10.** *Williams v. Alyeska Pipeline Serv. Co.,* 650 P.2d 343, 351 (Alaska 1982).

**11.** See Footnote 8.

tion in order to minimize acquisition costs.[12] Often, extraordinary delay was also involved.[13] Neither of these factors seem to be present here, at least not clearly.

*Lange v. State*, 86 Wash.2d 585, 547 P.2d 282 (1976), is the case most favorable to Ehrlander's position. Lange was in the process of developing land for housing purposes when the marketability of his land was substantially impaired by a series of highway department actions leading to an announcement made on December 1, 1969 that a proposed highway would include most of Lange's land. In October of 1971, the state filed an action to condemn Lange's property. Lange had, in the meantime, filed an action in inverse condemnation. After the two actions were consolidated, the trial court dismissed the inverse condemnation action, finding that the delay was not unreasonable and that although there was a decline in value of the property between 1969 and 1971, it was caused not by the actions of the condemnor but by a general decline in property values in the area. *Id.* 547 P.2d at 283–84.

On appeal, the Supreme Court of Washington reversed and held that the highway department had taken Lange's property as of December 1, 1969. The supreme court did not take issue with the trial court's finding that the delay had not been unreasonable and that the condemning authority had not caused a decline in the value of the property. *Id.* at 284. Nonetheless, it noted that the the state's action had effectively deprived Lange "of the most important incidents of ownership, the rights to use and alienate property." *Id.* at 288. The court announced a four-part test for application in future cases:

> For the time of valuation to be advanced, [1] marketability must be substantially impaired and [2] the condemning authority must have evidenced an unequivocal intention to take the specific parcel of

land. [3] The special use of the land by the owner must be acquiring and holding the property for subsequent development and sale. [4] Further, the owner must have taken active steps to accomplish this purpose. A property owner who purchased land or took steps to market it in contemplation of the condemnation could not insulate himself from a later general decline in market values and benefit from the holding in this case.

*Id.*

In *Stewart & Grindle v. State*, 524 P.2d 1242, 1247 (Alaska 1974), we recognized the plight of the owner of unimproved land who is unable to sell or develop it because of a pending condemnation action. The question in that case was whether interest on the condemnation award should run from the date eminent domain proceedings were instituted to the date of payment into the registry of the court of the actual award of just compensation.[14] We recognized that possession of unimproved and untenanted property is a desirable economic asset only if: "(1) the property may appreciate in value; and (2) the owner is afforded the opportunity to improve the property toward whatever end he might desire." We noted that these economic attributes were lost when a condemnation action was brought because of a statute which fixed the valuation date as the date of the issuance of the summons and precluded inclusion of improvements put on the property after the date of the summons.[15] We went on to note:

> Meanwhile, the owner remains liable for property taxes, mortgage payments and any other expenses incidental to legal ownership. Indeed, the property is of less value in his own name than it would be had the state taken immediate legal possession under a declaration of taking, for at least in the latter case he would be delivered from the burden of the property taxes. If, as a matter of constitution-

---

**12.** *E.g., Roth v. State Highway Commission of Missouri,* 688 S.W.2d 775 (Mo.App.1985); *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 424 F.2d 574 (1970).

**13.** *Id.*

**14.** The state did not use the declaration of taking procedure, as it did in this case, nor did it enter into immediate possession. Thus it was unclear as to when interest would begin to run.

**15.** AS 09.55.330.

al law, the property owner is entitled to interest from the moment that the state takes legal possession, he should, *a fortiori*, receive interest when he has been deprived of all the economic advantages of legal ownership but is relieved of none of the liabilities.

Admittedly, between the filing of an action and settlement or judgment, the state derived no benefit from unimproved land either. But the state's benefit is irrelevant. The constitutional mandate is framed in terms of just compensation for the owner, and just compensation is not conditioned on receipt of commensurate value by the state.

524 P.2d at 1247.

In our view this reasoning should be applicable not merely when a condemnation action is formally begun, but whenever a property owner is, by reason of an impending condemnation, deprived of the economic advantages of ownership. That was the rationale of the Washington court in *Lange*:

> Once the state manifested its unequivocal intent to appropriate the Lange property, appellants were precluded from exercising their business judgment and selling the property before the market fell further. Moreover, appellants were precluded from taking any steps to counteract the market decline by making improvements on the land or otherwise

changing its use. Thus appellants were deprived of the most important incidents of ownership, the rights to use and alienate property.

547 P.2d at 288. We thus agree with *Lange* and believe that its holding should be applicable here. As the *Lange* test does not require either extraordinary delay or a bad faith motive to depress land prices, the state's argument that the absence of these factors means that Ehrlander has not made a prima facie case of an imputed taking must fail.

■ For this reason, summary judgment was improperly granted in favor of DOT.[16] The judgment in favor of DOT must therefore be reversed and this case remanded for a determination of whether the four *Lange* elements can be factually established.[17]

### III.

■ Ehrlander's second point on appeal is that even as to his claim which is based on the partial denial of his subdivision application by the platting board, his failure to exhaust available administrative remedies is no bar. We do not reach this question as we are of the view that Ehrlander has shown no facts which would give rise to DOT's liability for the borough platting board's partial denial of the subdivi-

---

16. The exhaustion doctrine articulated in *Ben Lomond* does not control. In the fall of 1983, when Ehrlander was forced to decide whether to pursue an appeal to the planning commission, he could not have presented a claim based on *Lange*. *Lange* requires, *inter alia*, that the property owner demonstrate (1) substantially impaired marketability and (2) unequivocal statements of an intent to take a specific parcel. In the fall of 1983, the marketability of Ehrlander's property may not have substantially declined because the platting board had indicated it would take a second look in the spring of 1984. A prospective buyer might reasonably have relied on this and so, of course, might have Ehrlander in deciding not to appeal. As to when DOT unequivocally expressed its intent to take Ehrlander's property there is a factual dispute. Under one view of the facts, such did not occur until long after the 30–day period for administrative appeals had expired. *See* n. 17, *infra*.

Further, even if Ehrlander had appealed and won, Ehrlander would still have the opportunity to argue that there was an imputed taking under the *Lange* theory. The only effect subdivision might have had is that Lange might have sold the property before its marketability was substantially impaired. This, however, is speculative and it cannot be said with confidence that the administrative appeal would have eliminated the need for judicial review.

17. We note in particular that there seems to be a conflict in Ehrlander's position as to when DOT expressed an unequivocal intention to take the specific property in question. Ehrlander in his brief before this court contends that DOT was firmly committed to taking his property by October 26, 1983. However, in his motion for a new trial in the condemnation case, Ehrlander claimed that "at least until July of 1985, if not later, the location of the project was indefinite...."

sion.[18]

There are a number of authorities which hold that a condemning authority is responsible for an inverse condemnation where it persuades a platting or planning agency to impose restraints on the use or development of property in order to minimize the acquisition costs of a contemplated project.[19] In the present case, however, it does not appear that DOT urged the platting board to disapprove any part of Ehrlander's proposed subdivision.

DOT signed a form stating that it had no objection to the full subdivision on July 21, 1983, and reiterated this position in another comment dated August 18, 1983. The partial rejection of the subdivision took place on August 24, 1983. When reconsideration was sought, DOT filed a platting review comment which recommended the phased development that the board had initially settled on, but stated: "If the developer does not agree to phased development[,] we would like to suggest that a note be placed on the plat describing the potential Geist Road Extension alignment through the lots affected and the date of location approval (Summer 1984)." Ehrlander stated that he had no objection to the note suggested by DOT on the final plat. The recommendation to the platting board that it adhere to the action that it had already taken was not an action sufficient to make DOT liable for an inverse condemnation as it was explicitly conditioned on Ehrlander's agreement. As of September 14, 1983, when the platting board denied reconsideration, DOT's position was neutral.[20]

We therefore affirm the grant of summary judgment in favor of DOT with respect to Ehrlander's claim that DOT is liable for the partial denial of Ehrlander's subdivision plat.

## IV.

For the foregoing reasons, the judgment of the superior court is reversed in part and remanded for further proceedings in accordance with this opinion. In the event that an inverse condemnation is found, interest should run from the date of the inverse condemnation until April 29, 1986. Whether interest should be calculated on the award already made by the jury in the condemnation trial or whether a new value should be determined for the purpose of calculating interest is a question which has not been briefed and we express no opinion on it.

REVERSED IN PART and REMANDED.

---

**18.** In affirming a judgment, this court may rely on grounds different from those employed by the court below. *Ransom v. Haner,* 362 P.2d 282, 285 (Alaska 1961). Further, we express no view as to whether the partial denial of Ehrlander's subdivision request amounted to an imputed taking on the part of the borough.

**19.** *E.g., Roth v. State Highway Commission of Missouri,* 688 S.W.2d 775 (Mo.App.1985) (highway engineer urged municipality to refuse rezoning and deny building permits for property in the pathway of a proposed highway); *Gaughen v. Commonwealth, Dept. of Transportation,* 123 Pa.Cmwlth. 550, 554 A.2d 1008 (1989) (DOT repeatedly asked township to delay development within highway corridor and interfered with developer's efforts to obtain financing); *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 424 F.2d 574 (1970) (National Park Service actively thwarted proposed subdivision of property slated for inclusion in national seashore area).

**20.** The Supreme Court of California has stated in a similar context:

If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land.

*Selby Realty Co. v. City of San Buenaventura,* 514 P.2d 111, 117 (Cal.1973).

APPENDIX

APPENDIX

KEY: ☐ Subdivision approved August 1983   ■ Section A, subdivision initially denied, approved October 24, 1984   ▨ Section B, subdivision denied

RABINOWITZ, Justice, concurring in part and dissenting in part.

I agree that "Ehrlander has shown no facts which would give rise to DOT's liability for the borough platting board's partial denial of the subdivision," and that the exhaustion doctrine articulated in *Ben Lomond, Inc. v. Municipality of Anchorage*, 761 P.2d 119, 121–22 (Alaska 1988) does not bar Ehrlander from pressing an inverse condemnation claim against the state regarding that portion of his land designated as "Section B" in the appendix. I believe *Ben Lomond* is dispositive, however, of Ehrlander's claim to a temporary taking of "Section A." No article I § 18 inquiry whatsoever regarding this parcel would now be necessary had Ehrlander successfully appealed (in whole or in relevant part) the Board's October 1983 partial denial. *See Ben Lomond*, 761 P.2d at 122.