Peter MOORE, Appellant,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellee.

No. S-5324.

Supreme Court of Alaska.

June 17, 1994.

---

**766**

Kevin Dougherty, Anchorage, for appellant.

Carolyn E. Jones, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee.

James A. Gasper, Jermain, Dunnagan & Owens, P.C., Anchorage, for amicus curiae Public Safety Employees Ass'n.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON, JJ., and BRYNER, J. pro tem.*

*OPINION*

ALEXANDER O. BRYNER, Justice, pro tem.

This appeal calls upon us to decide whether the merit principle of employment embodied in article XII, section 6 of the Alaska Constitution forbids state agencies from seeking to reduce public spending by "privatizing" state jobs—that is, by eliminating positions on the state workforce in favor of lower cost private contracts for the same services.

## I. BACKGROUND

The facts are not disputed. The State of Alaska, Department of Transportation and Public Facilities (DOT), owns and operates 219 rural airports, including the Tanana Airport. The Tanana Airport serves a population of approximately 420 people. In the past, maintenance at the Tanana Airport has been performed by two DOT employees, one full-time and one seasonal. As of fiscal year 1992, annual maintenance costs for the airport were estimated at $164,626.

DOT hired Peter Moore for the full-time position at the Tanana Airport on October 25, 1983. He worked at the job under a contract between the State and Public Employees Local 71 (AFL–CIO), Labor, Trades and Crafts Unit Employees, for the next eight years, receiving favorable evaluations each year, as well as several commendations and awards.

Some time during fiscal year 1992, DOT, prompted by declining state revenues, began examining various cost-cutting options. As part of this process, DOT conducted a cost comparison of the Tanana Airport and six similar airports. The comparison led DOT to conclude that Tanana Airport could be operated more economically if airport maintenance were contracted to a private firm. In March 1992, DOT solicited bids for maintenance at the airport. In May, DOT awarded a one-year maintenance contract to a private firm for $38,500, the lowest bid received. The State notified Moore that his position had been eliminated and that, as a result, his state employment would terminate effective

---

* Sitting by assignment made under article IV, sec- tion 16 of the Alaska Constitution.

June 30, 1992. On July 1, the private contractor took over maintenance at the airport.

Meanwhile, in response to DOT's termination notice, Moore filed a complaint in the superior court seeking declaratory relief. The complaint alleged that DOT's elimination of his job in favor of a private contract for the same services violated the merit principle set forth in article XII, section 6 of the Alaska Constitution and sought a declaration that the private maintenance contract was void. Moore moved for summary judgment on his claim; DOT opposed and filed a cross-motion for summary judgment. After hearing argument, Superior Court Judge Karl Johnstone denied Moore's motion for summary judgment and granted DOT's cross-motion.

## II. DISCUSSION

### A. *Exhaustion of Administrative Remedies.*

■ On appeal, Moore renews the constitutional claim he raised below. As a threshold matter, however, we must consider whether Moore's declaratory judgment action was properly brought. The State characterizes Moore's claim as a challenge to DOT's termination of his state employment. Based on this characterization, the State maintains that Moore should be barred from pursuing a remedy in court until he has exhausted his administrative remedies. *See, e.g., Standard Alaska Prod. Co. v. Alaska,* 773 P.2d 201, 210–11 (Alaska 1989); *Ben Lomond, Inc. v. Anchorage,* 761 P.2d 119, 122 (Alaska 1988) (exhaustion of administrative remedies required when a claim for declaratory relief can be characterized as raising both constitutional and non-constitutional issues, as well as mixed questions of law and fact). Because Moore's state employment was subject to a collective bargaining agreement that prescribed a union grievance procedure as the exclusive means of resolving disputes over dismissal, demotion, and suspension, the State insists that Moore was obliged to pursue this contractual remedy instead of filing an action for declaratory relief. *See, e.g., Beard v. Baum,* 796 P.2d 1344, 1348–49 (Alaska 1990); *Walt v. State,* 751 P.2d 1345, 1350–51 (Alaska 1988); *Public*

*Safety Employees Ass'n v. State,* 658 P.2d 769, 772–73 (Alaska 1983).

The State's characterization of Moore's claim is inaccurate. Moore raises no factual issues concerning the circumstances surrounding the termination of his employment. He does not question DOT's good faith in deciding to eliminate his position. Nor does he contend that he was discharged for any reason other than DOT's desire to cut costs by entering into a private contract for airport maintenance, or that DOT will not in fact save money by eliminating his position and entering into the private contract. Likewise, Moore does not argue that DOT violated the collective bargaining agreement, any of its own regulations, or any applicable statutes. Moore elected to request declaratory judgment on only a single, narrow proposition: that the Alaska Constitution's merit system provision categorically bars the State from privatizing state jobs. As raised in this case, the issue is one of purely constitutional dimension.

We have previously recognized that "[e]valuations of constitutionality and other 'pure' issues of law are within the special expertise of the courts rather than [agencies]." *United States v. RCA Alaska Communications,* 597 P.2d 489, 507 (Alaska 1979). For this reason we have stated that "exhaustion, generally, is not required when the constitutionality of [state action] is the only issue raised in a case." *Ben Lomond,* 761 P.2d at 121–22 (citing 4 K. Davis, *Administrative Law Treatise,* § 26:6 (2d ed. 1983)).

Moore's case is not one in which a procedural challenge to agency decisionmaking has simply been dressed in constitutional clothing. *See, e.g., Eidelson v. Archer,* 645 P.2d 171, 178 (Alaska 1982). Nor is it one involving an attempt to substitute a damage claim in tort for an unperfected administrative remedy. *See, e.g., Walt v. State,* 751 P.2d at 1350–51 (Alaska 1988).

Neither DOT nor an arbiter under the collective bargaining agreement would have been competent to afford Moore the relief he seeks: a declaration that the constitution bars privatization of state jobs. Since

Moore's request for declaratory relief called upon the superior court to review only the scope of the Alaska Constitution's merit system language, it cannot fairly be characterized as being merely a challenge to DOT's decision to terminate his employment. *Cf. Owsichek v. State*, 627 P.2d 616, 619 (Alaska 1981) (holding that portion of complaint requesting declaratory relief from allegedly unconstitutional state action should have been heard as original action in superior court, while portion of complaint requesting injunctive relief and damages requiring review of prior administrative agency action, was properly heard as an appeal). Under these circumstances, exhaustion of administrative remedies was not required.[1]

## B. *Privatization and the Merit Clause*

■ We proceed to the substance of Moore's claim. Because Moore raises a question of law requiring interpretation of the Alaska Constitution, we review the trial court's ruling independently and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

Article XII, section 6 of the Alaska Constitution commands the legislature to "establish a system under which the merit principle will govern the employment of persons by the State." As Delegate Sundborg noted during the Alaska Constitutional Convention, the principal policy reason for adopting this provision was to ensure that state employees would be hired and retained "on the basis of their merits rather than on the basis of their politics." 4 Proceedings of the Alaska Constitutional Convention (PACC) 2887–88 (Jan. 23, 1956). Delegate Sundborg went on to add: "The converse of the merit principle is the spoils system, and anyone who doesn't want to have a merit principle ... must, I think, be in favor of a spoils system." *Id.* at 2888.

Recently, in *Alaska Pub. Employees Ass'n v. State*, 831 P.2d 1245 (Alaska 1992), this court emphasized the broad and complex nature of the constitutionally mandated merit principle:

> Generally defined, the merit principle requires the recruitment, selection, and advancement of public employees "under conditions of political neutrality, equal opportunity, and competition on the basis of merit and competence." In actual practice, however, "the merit principle is more complex and ambiguous than the above definition reveals."

*Id.* at 1249 (citations omitted).

The Alaska legislature adopted the State Personnel Act (AS 39.25.010–.220) for the express purpose of defining and implementing the merit principle. *Id.* The Act's provisions strongly suggest that the merit principle extends not only to the process of selecting and retaining individual state workers, but also to the process of creating and eliminating state jobs. The Act's opening provision, which defines the merit principle,[2] ex-

---

1. Subsequent to the briefing and argument in this case, the State forwarded to the court an arbitrator's decision concerning a grievance filed by Moore's union concerning Moore's layoff. It appears that after the superior court's decision in this case, a grievance on Moore's behalf was timely filed. The arbitrator ruled in favor of the State, concluding as a matter of contract interpretation that the merit system principles embodied in the contract were not violated by the layoff of Peter Moore. The arbitrator declined to rule on the constitutional question presently before us, stating:

> It is undisputed that the grievant has the right to assert in a court of law that contracting out the maintenance work at the Tanana Airport, abolishing his state job there, and subsequently laying him off violated section 6 of article XII of the Alaska Constitution....

*Public Serv. Employees Local 71, AFL–CIO v. Department of Transp.*, p. 15 (Nov. 19, 1993) (Dorsey, Arb.).

2. AS 39.25.010 provides:

> (a) It is the purpose of this chapter to establish a system of personnel administration based upon the merit principle and adapted to the requirements of the state to the end that persons best qualified to perform the functions of the state will be employed, and that an effective career service will be encouraged, developed and maintained.
> (b) The merit principle of employment includes the following:
> (1) recruiting, selecting, and advancing employees on the basis of their relative ability, knowledge, and skills, including open consideration of qualified applicants for initial appointment;

pressly recognizes the need to keep partisan politics from playing a role in the elimination of either state workers or their jobs. Thus, AS 39.25.010(b) includes within the ambit of the merit principle "retention of employees with permanent status on the basis of the adequacy of their performance ...," AS 39.-25.010(b)(3), as well as "selection and retention of an employee's position secure from political influences," AS 39.25.010(b)(5).

The Personnel Act's inclusion of state jobs as well as state workers within the ambit of the Alaska Constitution's merit system language is hardly surprising in light of the merit principle's overriding objective of eliminating the spoils system of government: "History, both recent and distant, show[s] that reductions in force and administrative reorganization have been used as a means of circumventing employee protections." R. Vaughn, *Principles of Civil Service Law* [hereinafter Vaughn] § 4.4, at 4–25 (Matthew Bender 1976). Standing alone, however, the mere conclusion that the merit principle applies to the state's relations with public workers and jobs alike tells us little, for it begs the crucial question: What does the merit principle allow, and what does it forbid, regarding the elimination of jobs, as opposed to the termination of individual workers?

■ This question is susceptible to no ready answer; its resolution requires the balancing of competing factors. On one hand, we must not lose sight of the merit principle's basic goal of insulating the state workforce from political influence. On the other hand, we must bear in mind that the basic function of state government is to govern, not to employ; and to govern effectively, the state must govern efficiently.

The potential for conflict between the merit principle and need for governmental efficiency was apparent to the drafters of the Alaska Constitution when they considered the language of the merit system provision; they made it clear that the merit principle was not intended to impede the efficient management of state affairs. For example, in advocating language making implementation of the merit principle mandatory, Delegate Sundborg expressed his desire that Alaska's government service "be one in which all of the people who are working are people with ability and people who are entitled to hold the positions they have on the basis of their merits rather than on the basis of their politics." 4 PACC 2888 (Jan. 23, 1956) (Comments of Delegate Sundborg). At the same time, however, Delegate Sundborg assured the convention that "[a] man isn't frozen into his job permanently just because he is hired under a merit system." *Id.* at 2894.

The premise that the merit principle does not bind the government to retain a workforce it cannot afford has long been established: "The authority of government to separate employees for economic reasons is widely accepted. The necessity for this authority is apparent if the government is faced with financial or organizational difficulties." Vaughn, § 4.4, at 4–16. Thus, government agencies functioning under various forms of the merit system have traditionally been accorded broad latitude to eliminate jobs for economic, as opposed to political reasons:

> Perhaps the greatest discretion which the agency exercises is the ability to determine whether or not a reduction-in-force is to take place. [United States Civil Service] Commission regulations state: "Only the agency can decide what positions are required, where they are to be located, and when they are to be filled, abolished, or vacated."

*Id.* at 4–19 (footnote omitted).

In keeping with this approach, the State Personnel Act broadly authorizes Alaska's personnel board to adopt rules providing for "layoffs for reason of lack of money or work, abolition of positions, or material changes in

(2) regular integrated salary programs based on the nature of the work performed;
(3) retention of employees with permanent status on the basis of the adequacy of their performance, reasonable efforts of temporary duration for correction in inadequate performance, and separation for cause;

(4) equal treatment of applicants and employees with regard only to consideration within the merit principles of employment; and
(5) selection and retention of an employee's position secure from political influences.

duty or organization[.]" AS 39.25.150(13). Personnel rules adopted under the authority of the Act set forth elaborate provisions to mitigate the impact of layoff orders on affected state workers but leave intact the broad power of agencies to decide when layoffs should be ordered and what positions should be eliminated.[3] In relevant part, the rules allow agencies to "lay off an employee in the classified service if ... the employee's position is abolished, if there is a shortage of work or money, or for other reasons outside the employee's control." 2 AAC 07.405(a).

■ We think it clear, then, that the merit principle, as expressed in article XII, section 6 of the Alaska Constitution, ordinarily allows state agencies broad discretion to eliminate positions and order layoffs for reasons of efficiency and economy, provided that their decisions are not politically motivated. The remaining issue for decision here is whether a different, more restrictive rule is constitutionally compelled in the specific context of privatization, when the decision to cut spending by ordering layoffs is accompanied by a plan to enter into lower-cost private contracts for the same services.

Other jurisdictions addressing the relationship between privatization and the merit principle are divided: some conclude that the merit principle neither bars nor restricts agency discretion to privatize;[4] others express reservations concerning the compatibility of privatization and the merit principle, at least in the absence of detailed regulations specifying the circumstances under which existing jobs may be eliminated in favor of private sector contracts.[5]

The differences reflected in the case law may be explained to some extent by the variety of factual circumstances courts have considered and by the peculiarities of the statutory and constitutional schemes within which each case has arisen and been decided. To a larger extent, however, these differences simply reflect the divergent judicial views that different courts have brought to a genuinely close and difficult issue—an issue that necessitates the resolution of competing policies:

> Privatization of government services has significant policy implications for the state personnel system. Privatization can pro-

---

**3.** Specifically, the topic is addressed in 2 AAC 07.405, which provides:

> (a) An appointing authority may lay off an employee in the classified service if the employee holds a substitute appointment, if the employee's position is abolished, if there is a shortage of work or money, or for other reasons outside the employee's control. A layoff does not reflect discredit on the service of the employee. The name of a laid-off employee must be placed on the appropriate noncompetitive eligible list and may remain on it for a period of two years. If the employee is not reappointed within two years, the employee is considered to have separated without prejudice.
> (b) No permanent or probationary employee in the classified service may be laid off while there are emergency, provisional, or nonpermanent employees serving in the same class in the same department or organizational unit, or serving in other classes performing work to which the permanent or probationary employee could reasonably be assigned.
> (c) The order of layoff must be based upon performance reports and seniority under a formula established by the director. The appointing authority may allow an employee to volunteer for layoff before an employee whose name appears higher in the order of layoff.
> (d) The appointing authority shall give a permanent or probationary employee at least two

weeks' notice before the employee is laid off. The notice must be written and must state the reason for the layoff. The appointing authority must provide the director with a copy of the notice.
> (e) The names of permanent or probationary employees who are voluntarily demoted instead of being laid off will be placed on the appropriate layoff list for the class from which demoted and remain on it for a period of two years until appointed to a position at or above the salary range from which demoted, whichever comes first. (In effect before 6/28/84; am 6/28/84, Register 91)

**4.** See, e.g., Michigan State Employees Assoc. v. Civil Serv. Comm'n, 141 Mich.App. 288, 367 N.W.2d 850, 852 (1985); Carter v. Ohio Dep't of Health, 28 Ohio St.3d 463, 504 N.E.2d 1108, 1109 (1986); Moncrief v. Tate, 593 S.W.2d 312, 314 (Tex.1980).

**5.** See, e.g., Colorado Ass'n of Pub. Employees v. Department of Highways, 809 P.2d 988 (Colo. 1991); Jack A. Parker & Assoc., Inc. v. State, 454 So.2d 162 (La.Ct.App.1984); Washington Fed. Etc. v. Spokane Community College, 90 Wash.2d 698, 585 P.2d 474, 477–78 (1978); cf. California State Employees Ass'n v. State, 199 Cal.App.3d 840, 245 Cal.Rptr. 232 (1988).

vide important benefits by reducing costs and increasing governmental efficiency and productivity. *See* Note, *Civil Service Restrictions on Contracting out by State Agencies*, 55 Wash.L.Rev. 419, 424–26 (1980). *See generally* R. Cass, *Privatization: Politics, Law, and Theory*, 71 Marq. L.Rev. 449 (1988). On the other hand, privatization operates as a labor policy in that it affects the qualifications and conditions of employment of persons who will perform services for the government. *See* Becker, *With Whose Hands: Privatization, Public Employment and Democracy*, 6 Yale L. & Pol'y Rev. 88 (1988).

*Colorado Ass'n of Pub. Employees v. Department of Highways*, 809 P.2d 988, 994 (Colo. 1991).

■ Considering these policies in light of the underlying purposes of the merit system and in light of the traditional discretion accorded governmental agencies to determine the need for reductions in force, we are not convinced that the Alaska Constitution's merit system provision should be construed as a categorical bar to privatization.

Nothing in the Personnel Act or the Public Employment Relations Act, AS 23.40.070–.260, restricts the state from reducing its workforce and laying off personnel for reasons of economy. More specifically, neither act prohibits state agencies from resorting to privatization as a cost-cutting measure. In addition, the State Procurement Code, AS 36.30.005–.995, vests the executive branch with broad authority to enter into contracts for services and professional services;[6] no

provision of the Procurement Code bars privatization.

Under the laws and regulations currently in force, there appears to be relatively little danger that privatization could successfully be used as a device for subverting the merit principle's primary goal of shielding state workers and jobs from political influence. As we have previously noted, state personnel rules that deal with layoffs offer protection against political influence by ensuring that state workers who are potential targets of layoff are treated fairly and that the effects of any actual layoff are mitigated. Furthermore, the State Procurement Code establishes extensive control over agency contracting procedures. These measures are calculated to ensure that the State accords fair treatment to persons and businesses seeking to enter into state contracts.

Moore nevertheless argues that privatization could be used as a means of subverting state policies relating to worker qualifications, conditions of employment, and benefits. He points to numerous statutory provisions that confer rights and benefits on state workers.[7] Moore argues that, since private contractors will be under no obligation to afford their workers the same benefits, privatization violates public policy by allowing the State to avoid costs of employment that it should properly bear.

To a limited extent, this argument provides legitimate cause for concern. There is at least some danger that privatizing state jobs can be used as a means of circumventing policies relating to qualifications and conditions of employment.[8] In our view, however,

---

6. *See* AS 36.30.005, .015, .040.

7. *See, e.g.*, AS 39.25.150(3) (providing for selection of state workers through open competitive examinations based on capacity and fitness); AS 39.30.090 (insurance); AS 39.20.225 (personal leave); AS 39.25.159 (veterans preference).

8. In this regard, the economic benefits of privatizing may, in some instances, be more illusory than real. As the Colorado Supreme Court has observed:

> The competitive cost advantage of the private companies, however, may result from their freedom from the state personnel system. For example, private companies have great latitude

in selecting, promoting, transferring and terminating employees; they are not required to employ competitive tests of competence. Absent specific statutory requirements, private contractors need not follow the legislatively mandated pay scales, veteran's preferences, and other employment practices that apply to the civil service.

*Colorado Ass'n of Pub. Employees*, 809 P.2d at 994 (footnote omitted). In some instances, the short term economic benefit to the state in employing lower-cost contract labor, may, in the long term, be more than offset by social costs of employing workers who are not subject to state qualifications standards and are not provided with various benefits to which state workers would be entitled.

the potential danger to the merit system appears relatively slight. While the social costs of privatizing the state workforce might justify legislative scrutiny, and while situations requiring judicial intervention on a case-by-case basis may arise from time to time, the risk that privatization poses to the merit system does not warrant the somewhat drastic measure of declaring it constitutionally barred.

■ Establishing qualifications and conditions of employment to ensure a stable and experienced body of civil service workers is unquestionably among the varied goals of the merit principle. But in terms of the principle's constitutional purpose, this goal is secondary to the principle's primary objective of securing state workers against the evils of the spoils system. As we have already mentioned, to the extent that privatization creates a risk of exposing state workers to political influence, that risk is largely obviated by provisions of the State Personnel Act and state personnel rules dealing with layoffs and by provisions of the State Procurement Code and the rules promulgated thereunder dealing with state contracts.

Furthermore, while various state statutes and regulations dealing with qualifications, conditions of employment, and benefits for state workers are certainly meant to further the merit principle, it is not the goal of these provisions to establish minimum standards of employment for general, statewide application. Statewide labor standards and benefits are extensively dealt with under Title 23 of the Alaska Statutes,[9] as well as under Title 36, which establishes specific standards applicable to public contracts.[10] Provided that a state contract for services meets the requirements of the Procurement Code and complies with applicable statewide standards, as well as with specific standards applicable to public contracts, we fail to see how the contract could be deemed to violate public policy.

Finally, any risk arising from privatization must be balanced against the countervailing dangers of an unduly rigid reading of the Constitution's merit system language—a reading that could well extend the merit system provision beyond its originally intended scope.[11] In this regard, it is worthwhile recalling Delegate Sundborg's assurance that state workers would not be "frozen into [their] job[s] permanently just because [they] were] hired under a merit system." 4 PACC 2894 (Jan. 23, 1956) (Comments of Delegate Sundborg).

In short, neither the political nor the social danger of privatization appears so threaten-

9. *See, e.g.,* AS 23.10.050–.150 (Alaska Wage and Hour Act).

10. *See, e.g.,* AS 36.05.010–.110 (wages and hours of employment); AS 36.10.005–.990 (labor preference).

11. With regard to the weight the merit principle deserves in this balance, Moore attaches inordinate significance to this court's recent decision in *Alaska Pub. Employees Ass'n (APEA),* 831 P.2d 1245. Moore argues that the merit system, as construed in *APEA,* protects the right of state employees against elimination of their positions, even where contracting the work out to the private sector would result in substantial savings to the State. The Public Safety Employees Association, as amicus, also argues that this Court's holding in *APEA* establishes that the merit system protects public employees' rights "first and foremost, and prohibit[s] the unilateral disregard of those rights by the state, particularly on the basis of mere economics."

In *APEA,* this court found a potential conflict between the state's authority to assign salary ranges to job classifications—an aspect of its responsibility to carry out the merit principle— and the economic interest of state workers in having salary range assignments be made a subject of collective bargaining. *Id.* at 1250. Emphasizing the breadth and significance of the merit principle, we found the state's interest in the merit principle outweighed the economic interest of the employees. *Id.* at 1249, 1251–52.

The State correctly recognizes that *APEA* has little precedential significance regarding the issue currently before this court. *APEA* involved a conflict between the merit principle and the economic interests of state employees that arose in the narrow context of a collective bargaining issue. Nothing in *APEA* stands for the broad proposition that the state's economic interests should be categorically subservient to the merit principle whenever a conflict arises. In *APEA* we balanced the competing interests in light of the specific circumstances presented, finding those circumstances to present "a close and difficult question." *Id.* at 1250 (quoting *State v. Public Safety Employees Ass'n,* 798 P.2d 1281, 1287 (Alaska 1990)). The case before us now presents different circumstances, and the balance of competing interests yields a different conclusion.

ing to the merit principle as to justify reading a categorical bar against privatization into the Alaska Constitution's merit system provision. To the extent such dangers prove real, we are confident that existing contractual, administrative, and judicial channels for case-by-case review of agency action will be capable of enforcing the merit principle and of providing redress to aggrieved employees.[12]

## III. CONCLUSION

In the present case, Moore advanced no claim that his position was eliminated in bad faith or for reasons unrelated to cost-savings. Nor did Moore assert that the elimination of his position failed to accomplish its cost-saving goal, or that it violated any applicable procedural requirement. We have indicated in this opinion that such claims, had Moore desired to assert them, should have been raised in the first instance through available administrative or contractual channels. Moore's sole contention here is that article XII, section 6 of the Alaska Constitution categorically bars privatization of state jobs for economic reasons. We hold that it does not.

The superior court's order granting summary judgment is AFFIRMED.

RABINOWITZ, Justice, with whom COMPTON, Justice, joins, dissenting.

Article XII, section 6 of the Alaska Constitution provides that "The legislature shall establish a system under which the merit principle will govern the employment of persons by the State." Although I agree with the court's conclusion that this constitutional provision does not stand as a categorical bar to the privatization of state jobs for economic reasons, I am unable to join in the court's sanguine predictions that privatization is unlikely to subvert the existing merit system and that "existing contractual, administrative, and judicial channels for case-by-case review of agency action ... will be capable of enforcing the merit principle."

The court's analysis of the issues in this appeal fails to address several significant questions that Moore has raised. A conclusion that article XII, section 6 is not a categorical bar to privatization for economic reasons leaves unresolved how to preserve the merit system that has been established in response to this constitutional mandate. For instance, assuming the absence of any impermissible political motive, is either the executive or legislative branch of Alaska's government free to privatize all existing and future governmental jobs and thus totally subvert the merit system? If not, upon what principles and criteria are restraints upon privatization to be fashioned? Should governmental positions customarily and historically filled by civil servants be immune from privatization? Should current civil servants, and current positions, be given more protection than prospective employees and newly created positions? Or should privatization be barred by our constitution's merit principle, in the absence of detailed standards specifying the circumstances under which existing

---

12. *Cf. Moncrief v. Tate*, 593 S.W.2d 312, 314 (Tex.1980) (declining to prohibit privatization and holding "that the issue of good faith in abolishing a civil service position presents a question of an abuse of discretion by the [abolishing agency] which is a question of law for the decision of the judge").

The case-by-case approach taken in *Moncrief* also appears to be the formula advocated by Robert Vaughn in his treatise, *Principles of Civil Service Law:*

A familiar rule of evidence is that the party with best access to the facts carry the burden of producing evidence on a particular issue. Given the complexity of reduction-in-force actions it seems appropriate to place the burden of coming forward with evidence to establish good faith upon the government. This burden, appropriately interpreted, would not unduly

hamper the administrative agency nor improperly restrict the scope of administrative discretion.... [A] showing that the reduction in force was primarily motivated by economic or other permissible reasons would seem sufficient to meet this burden. Once this burden had been met by the agency, it would become the responsibility of the employee to establish other motivation for the action. Only by allocating the burden of proof in this matter can the legitimate purposes not only of reduction in force authority but also of the procedures for employee removal be adequately protected. Otherwise, reductions in force will become a mechanism for subverting procedural protections applied to disciplinary removals from public employment.

Vaughn, § 4.4, at 4–24, 4–25.

jobs may be eliminated in favor of private sector contractors? [1]

As to this last question, I find persuasive the approach of the Colorado Supreme Court:

> [P]rivatization operates as a labor policy in that it affects the qualifications and conditions of employment of persons who will perform services for the government....
>
> ... Absent specific statutory requirements, private contractors need not follow the legislatively mandated pay scales, veteran's preferences, and other employment practices that apply to the civil service. The civil service laws and regulations protect public workers from arbitrary and oppressive treatment, and require due process protections before disciplinary action or termination; private employees lack these protections.[2] These constraints are necessary in government employment to carry out the functions of the civil service, promote competence in government, and ensure a politically independent civil service. These labor policy aspects of privatization, which are essential components of its cost efficiency, have significant consequences for the civil service.

This critical impact of privatization on the state personnel system implicates the legislature's role in structuring the system consistent with constitutional constraints, and invokes both the Board's rulemaking mandate and the Director's duty to provide leadership in state personnel management. The scope and characteristics of any plan of privatization and means by which such a plan is to be implemented require careful consideration. *Legislation, rules, or some combination thereof establishing standards will be necessary to ensure that privatization does not subvert the policies underlying the state personnel system. This requires an evaluation of the effects of the concept of privatization on the state personnel system as a whole, rather than a case specific consideration of the effect of a particular privatization plan of a single state agency on individual employees.*

*Colorado Ass'n of Pub. Employees v. Department of Highways*, 809 P.2d 988, 994 (Colo. 1991) (emphasis added) (footnote omitted).

I conclude that in order to effectuate the provisions of article XII, section 6 and ensure that privatization does not subvert the state's merit system, the legislature must enact discrete standards setting the preconditions for privatization.[3] These standards should be fashioned after a careful evaluation of the effects of privatization on the state's merit system for public employment as a whole, rather than upon a case-specific consider-

---

**1.** For example, California statutory law prohibits the award of private contracts when the impact would be to undercut state pay rates, displace civil service employees, or hinder the state's affirmative action efforts. *See* Cal.Gov't Code § 19130(a)(2)–(4) (West 1994). California also requires that the contracting agency balance the potential economic advantage of contracting against the public's interest in having the state government perform certain functions directly. *See id.* § 19130(a)(11).

**2.** It has been observed that privatization constitutes a fundamental restraint on the power of organized labor in the public sector. *See* Craig Becker, *With Whose Hands: Privatization, Public Employment, and Democracy*, 6 Yale L. & Pol'y Rev. 88, 90 (1988) (citing Harry Wellington & Ralph Winter, *The Unions and the Cities*, 62–65 (1971)).

**3.** We discussed the essentials of a merit system in *Alaska Public Employees Ass'n v. State*, 831 P.2d 1245 (Alaska 1992):

> Generally defined, the merit principle requires that recruitment, selection, and advancement of public employees "under conditions of political neutrality, equal opportunity, and competition on the basis of merit and competence." R. Vaughn, *Principles of Civil Service Law* § 9.3[6], at 9–27 (1976) (quoting Stanley, *What Are Unions Doing to the Merit Principle?*, 31 Pub. Personnel Rev. 109 (1970)). In actual practice, however, "the merit principle is more complex and ambiguous than the above definition reveals." *Id.* Our legislature adopted the Personnel Act for the express purpose of implementing the constitutionally mandated merit principle in state employment. AS 39.25.-010(a). Clearly recognizing the complexity of its task, our legislature also provided a detailed definition for the merit principle. Thus, by statute, "[t]he merit principle of employment includes ... regular integrated salary programs based on the nature of the work performed." AS 39.25.010(b). The elements of the merit principle's "salary programs," of course, are the classification plans and the salary plans adopted pursuant to AS 39.25.150.

*Id.* at 1249 & n. 7 (alterations in original) (footnote omitted).

ation of the effect of a single agency's particular plan upon individual employees. In my view, this court is ill-equipped to resolve the genuinely difficult policy issues inherent in the tension between privatization of government services and preservation of Alaska's merit personnel system. I would reverse the superior court's decision.