554 A.2d 1008

Thomas W. Gaughen, t/d/b/a TWG Real Estate Management Services, Appellant *v.* Commonwealth of Pennsylvania, Department of Transportation, Appellee.

Commonwealth of Pennsylvania, Department of Transportation, Appellant *v.* Thomas W. Gaughen, t/d/b/a TWG Real Estate Management Services, Appellee.

Argued November 1, 1988, before Judges CRAIG and PALLADINO, and Senior Judge BARBIERI, sitting as a panel of three.

*Joseph A. Klein, Law Offices of Joseph A. Klein, P.C.*, for appellant/appellee, Thomas W. Gaughen, t/d/b/a TWG Real Estate Management Services.

*William J. Cressler*, Assistant Counsel, with him, *John L. Heaton*, Chief Counsel, for appellee/appellant, Commonwealth of Pennsylvania, Department of Transportation.

OPINION BY SENIOR JUDGE BARBIERI, February 23, 1989:

Thomas W. Gaughen, t/d/b/a TWG Real Estate Management Services (Gaughen) appeals an order of the Cumberland County Court of Common Pleas sustaining his preliminary objections to a declaration of taking filed

by the Pennsylvania Department of Transportation (DOT) and dismissing in part and sustaining in part, DOT's preliminary objection to Gaughen's Petition for the Appointment of Viewers. DOT has cross-appealed from that same order.

This matter stems from *de facto* and *de jure* condemnation proceedings which concern a 226.778 acre tract of land in Hampden Township (Township), Cumberland County. Both proceedings were consolidated before the trial court.

DOT had plans dating back to 1964 to build a connector route between Interstate 81 (I-81) and U.S. Route 11 in the Township. In 1972, an interchange for the proposed connector route was built at I-81 but in 1977, the project was suspended by DOT for lack of funding.

A corridor for the proposed connector route has been part of the Township's comprehensive plan since 1970 and is marked on the zoning map. Although one potential corridor was shown as part of the Township's plan, DOT did not decide on the actual route for the connector project until the summer of 1987. A portion of the property in question lay within this corridor.

In the early 1970's, prior to its suspension for lack of funding, the project was on DOT's "twelve year plan." It was again placed there in 1984, although DOT did not pick a specific route for the roadway until the summer of 1987.[1]

Over the years, DOT has repeatedly asked the Township to delay development within the corridor. In light of advice from the Township solicitor, in July of 1986, Township officials advised DOT of their concern that any attempt by the Township to delay development could render it liable to landowners for a *de facto* taking.

---

[1] DOT had eight alternative corridors to choose from but only one was shown on the Township's plan.

On May 7, 1986, Gaughen signed a sales agreement to purchase 226.778 acres in the Township and the deed was recorded on December 5, 1986. Realizing that a portion of this property lay within the corridor for the proposed connector route, Gaughen met with DOT's chief engineer for District 8 in February of 1986, prior to purchasing the property. He was informed that the project was on the twelve year plan and studies were being undertaken concerning placement of the actual roadway.

Gaughen financed his purchase of the property by a conventional mortgage, carrying monthly mortgage payments of slightly over $16,000.00.

On July 7, 1986, Gaughen filed plans with the Township seeking to develop the tract as a Planned Residential Development (PRD) for senior citizens. He filed his application for tentative approval of a PRD and a conditional use on September 23, 1986. The tract was zoned R-S (Residential Suburban).[2] Pursuant to Section 703 of the Township zoning ordinance, PRDs are permitted in this zone as a conditional use. The PRD was first presented to the Township Planning Commission on October 9, 1986. On November 10, 1986, the Township tentatively approved the plans for Phase 1 of the five phase PRD and allowed the conditional use.

Phase 1 was to consist of a 312 unit senior citizens' apartment complex on approximately 16 acres.[3] The corridor was adjacent to Phase 1 but bisected Phase 2 and included portions of Phases 4 and 5.

---

[2] Approximately 15 acres of the tract are zoned C-G (Commercial General) and was not included in the proposed PRD.

[3] Phase 2 involved approximately thirty acres and consisted of 385 units of two, three and four stories; Phase 3 consisted of 69 single family homes around a chip and putt golf course; Phase 4 consisted of a 624 unit eight story high rise and Phase 5 consisted of approximately 51 acres for Gaughen's private residence.

Gaughen's financial advisor informed him that the most appropriate means of financing the PRD was by way of a tax exempt bond issued through the Cumberland County Housing and Redevelopment Authority (Authority). This method would result in Gaughen receiving a favorable rate of financing which was below the interest rate charged for conventional financing. The financing of these bonds was undertaken pursuant to the Federal HUD program which provides FHA insurance on the mortgage. This insurance is contingent upon ten percent co-insurance to be provided by a private mortgage lending company approved by HUD. ABG Associates (ABG) was the entity which was to process the FHA co-insurance application for financing Phase 1 of the project.

Robert Fowler, an expert witness on financing of residential developments, testified that some type of credit enhancement like that furnished through the FHA was necessary in order to successfully market a multi-family housing project to investors.

The trial court found that DOT repeatedly asked the Township to delay any proposed development. In a letter dated August 25, 1986 to a Township Commissioner, Mr. Mueser, DOT's district engineer for District 8-0, asked that approval of any development in the corridor be delayed until DOT obtained funds to institute protective buying.[4] DOT again requested Township officials to delay action on subdivision applications within the corridor at a meeting at DOT's District 8 office on September 8, 1986 and at a meeting with Township officials on October 14, 1986.

---

[4] Beginning in August of 1986, DOT requested FHA funds for protective buying in the corridor in order to purchase the property before it was developed. These funds were orally approved on November 10, 1986.

At a September 16, 1986 meeting, DOT informed Township officials that engineering and environmental studies would be employed over the next two years in determining the exact location for the connector route. There was a good deal of publicity surrounding the proposed connector route as evidenced by numerous articles appearing in local newspapers from September 1986 through January of 1987.[5]

A public meeting was held on November 24, 1986, where the protective buying within the corridor was announced by DOT. Although DOT had not yet finalized a route for the highway, it wanted to preserve the property within the corridor on the Township's zoning map. DOT filed an Authorization Plan with the Cumberland County Recorder of Deeds on November 20, 1986, notifying the owners of property within the corridor that it intended to condemn such property. Public meetings were held on November 24, 1986 and December 9, 1986 to discuss the authorization plan and protective buying. The right-of-way plans were shown to the public at the December 9th meeting.

A public hearing was held before the Authority on December 29, 1986 to receive public comments concerning the financing of Phase 1 of the project by issuing tax exempt bonds. A letter dated December 2, 1986 from Mr. Mueser to the Authority was made a part of the record. Despite the fact that no part of Phase 1 lay within the corridor, in the letter DOT notified the Authority that it was engaged in protective buying in the vicinity of the proposed project. The letter further expressed DOT's concern over the potential noise problem resulting from the proposed roadway on Phase 1's four story building.

---

[5] *See* Petitioner's Exhibit 14 to hearing before the trial court on October 29, 1987 and October 30, 1987.

Gaughen was required to disclose the contents of Mueser's December 2, 1986 letter to ABG. In a letter dated December 29, 1986, ABG's vice president advised Gaughen that in light of DOT's concern over the noise impact of the proposed connector route, a full environmental impact study would be required. ABG further advised Gaughen that in light of the expense in applying for co-insurance[6] he should not apply at that time.

Gaughen's financial consultant testified that the Mueser letter to the Authority "would have raised a red flag with any potential investor" and "completely stopped any pursuit of financing for [the] project."[7]

Gaughen did not pursue financing any further at that point nor did he seek final approval of his PRD. He testified that due to the publicity surrounding DOT's disclosure of the need for the connector route, he could not get contractors to bid on the project and a health service agency which was interested in leasing space on the site discontinued negotiations. He further testified that as of December of 1986, there was no way he could get financing for PRD and could not develop the property otherwise to generate enough funds to pay the monthly mortgage payments of $16,000.00 and the $30,000.00 per year in local real estate taxes. He stated that he could not even redesign his PRD because DOT had not yet determined the exact location of the proposed route.[8] Gau-

---

[6] Gaughen testified that the processing payment of approximately $320,000.00 was to accompany an application to ABG for co-insurance.

[7] Notes of Testimony from the hearing before the trial court on October 29-30, 1987 (N.T.) at 137 and 140.

[8] Gaughen received tentative approval of Phase 1 on November 10, 1986 and had six months to seek final approval. Further development of the entire project had to take place within two years. Pursuant to the Authorization Plan filed on November 20, 1986, DOT would not select a final route until it completed environmental impact and engineering studies and had held various public hearings.

ghen further testified that he had expended over $286,000.00 for engineering studies, architectural plans, and market analysis and feasibility studies related to financing the project.

On April 23, 1987, Gaughen filed a Petition for the Appointment of Viewers pursuant to Section 502(e) of the Eminent Domain Code (Code),[9] claiming that a *de facto* taking had occurred with regard to the entire 226.778 acres. On May 6, 1987, DOT filed a Declaration of Taking pursuant to Section 402(a) of the Code[10], condemning 59.235 acres of the tract and on September 15, 1987, it paid Gaughen $2,050,000.00 for the condemned property within the corridor. DOT filed preliminary objections to Gaughen's petition alleging it failed to state a cause of action and was "de minimis" in light of the Declaration of Taking. Gaughen filed preliminary objections to the Declaration of Taking alleging a *de facto* taking on December 5, 1986.

The *de facto* and *de jure* actions were consolidated for trial. The trial court found that the publicity surrounding DOT's proposed condemnation and its attempts to delay development in the corridor, along with its interference with Gaughen's effort to obtain financing, deprived him of the beneficial use and enjoyment of that portion of his property within the corridor. The trial court thus went on to hold that DOT's actions resulted in a *de facto* taking of the 59.235 acres in the corridor as of December 29, 1986, the date of ABG's letter suggesting that Gaughen was not able to recover certain costs incurred in designing his PRD pursuant to Section 609 of the Code.[11] Both parties have appealed the trial court's decision.

---

[9] Act of June 22, 1964, Sp. Sess., P.L. 84, *as amended*, 26 P.S. §1-502(e).

[10] 26 P.S. §1-402(a).

[11] 26 P.S. §1-609. This section provides that a judgment awarding compensation to a condemnee where proceedings were initiated

On appeal, Gaughen contends that the trial court erred in limiting its holding that a *de facto* taking had occurred to the 59.235 acres. He argues that DOT's actions deprived him of the highest and best use of the property as a PRD and thus resulted in a *de facto* taking of the entire tract. Gaughen further argues that once a *de facto* taking is found and a board of viewers appointed, a subsequent declaration of taking is a nullity. Therefore, he contends that the trial court erred by allowing testimony that DOT paid him $2,050,000.00 for the 59.235 acres it condemned and by making a finding to this effect.

DOT argues in its cross-appeal that the trial court erred in holding a partial *de facto* taking occurred. In support of this contention, DOT argues that the trial court improperly focused on the conduct of the condemnor rather than the effect of this conduct on Gaughen's use and enjoyment of that property found to have been taken. DOT maintains further that a partial *de facto* taking may not be found where the property owner has only pled an entire taking.

In sum then, both parties are appealing the trial court's order because Gaughen contends that DOT's actions amounted to a *de facto* taking of the entire tract pursuant to Section 502(e) of the Code, while DOT maintains that its actions do not even amount to a *de facto* taking of the 59.235 acres within the corridor.

Under Section 502(e), a condemnee may petition for appointment of viewers if he has suffered a compensable injury and no declaration of taking has been filed. *Greger v. Canton Township,* 41 Pa. Commonwealth Ct. 20, 399 A.2d 138 (1979). Our Supreme Court has held that a *de facto* taking has occurred when an entity clothed with the

---

under Section 502(e) "shall include reimbursement of reasonable appraisal, attorney and engineering fees and other costs and expenses actually incurred."

power of eminent domain substantially deprives an owner of the use and enjoyment of his property. *Conroy-Prugh Glass Co. v. Commonwealth,* 456 Pa. 384, 321 A.2d 598 (1974).

In establishing a *de facto* taking, the property owner bears the burden of proving exceptional circumstances which substantially deprive him of the use of his property and that the deprivation is the result of the actions of the governmental unit in question. *Filbert Ltd. Partnership Appeal,* 64 Pa. Commonwealth Ct. 605, 441 A.2d 1345 (1982).

As we stated in *Filbert* at 620-621, 441 A.2d at 1352:

The theory of de facto taking has been developed in response to the reality that activities carried on incident to massive, complex and time-consuming programs launched by government may so substantially interfere with one's use and enjoyment of his property as to inflict a compensable injury in a constitutional sense or as being within applicable statutory law, even though the power of eminent domain has not been formally exercised against the property in question and there has been no physical intrusion of it.

There is no exact test which we may employ to determine whether there has been a *de facto* taking. Instead, such determinations must be made on a case by case basis. *Filbert.*

We have held that simply recording state-approved plans for the location of a proposed public highway by governmental authorities and notice to property owners that their property would be condemned does not result in a *de facto* taking. *Commonwealth Appeal,* 422 Pa. 72, 221 A.2d 289 (1966). We have further held that government actions in approving and funding an urban renewal project which encompassed a tract of land owned by the

appellees and negotiating with affected property owners for acquisition of their parcels did not amount to a *de facto* taking. *Hazleton Redevelopment Authority v. Hudock*, 2 Pa. Commonwealth Ct. 670, 281 A.2d 914 (1971). In *Hazleton*, we reasoned that the property owners exercised full control and enjoyed all benefits accruing to property owners until formal condemnation. Any loss of market value of the properties would be compensated under Section 604 of the Code.[12]

In *County of Allegheny v. Church of Jesus Christ*, 14 Pa. Commonwealth Ct. 510, 322 A.2d 803 (1974), we held that the County's actions in publicizing its intent to expand its airport, approving it, and notifying the appellee of impending condemnation of a portion of its property did not constitute a *de facto* taking.

In another case, we held that no *de facto* taking had occurred where DOT had filed right-of-way plans for a proposed highway. *Department of Transportation v. Securda*, 16 Pa. Commonwealth Ct. 40, 329 A.2d 296 (1974). In *Securda*, the appellee's property was only partially within the right-of-way. Although DOT had condemned those portions of Securda's property within the right-of-way lines, it had not done so for the remaining portion although it stipulated additional portions might be needed. Although we noted that the inevitability of condemnation could deprive a property owner of the use and enjoyment of his property so as to establish *de facto* taking, there was no averment that access to Securda's property was impeded, that he was not able to use the property, or that he was threatened with actual loss.

---

[12] 26 P.S. §1-604. This section provides that any pre-condemnation change in a property's fair market value as a result of the imminence of condemnation, other than a change in value caused by a deterioration within the control of the condemnee, is to be disregarded in determining fair market value.

However, as we noted in *Filbert*, in *Commonwealth Appeal, Hazleton, Church of Jesus Christ*, and *Securda*, the governmental activity did not affect the owner's immediate use of the property or expose him to the loss of the property. Further, in each case, condemnation was imminent and this would fully compensate the owners by way of Section 604 of the Code.

A *de facto* taking of a 30 acre property was found to be sufficiently established to withstand a demurrer in *Department of Transportation v. Lawton*, 50 Pa. Commonwealth Ct. 144, 412 A.2d 214 (1980). There appellees owned property through which DOT proposed to build a connector route. Although no *actual* right-of-way had been formally approved, an "ultimate" one had been filed. Appellees were unable to lease buildings on the property or sell the tract in light of this fact and publicity surrounding the imminence of condemnation. Since appellees were not able to obtain the fair market value of the property from sale or rental, they did not pay the real estate taxes for two years and were faced with loss of the property through an eventual tax sale.

DOT filed preliminary objections to the declaration of taking contending the acts complained of were merely "preliminary, incidental and foreseeable" acts prior to a possible condemnation.

Holding that there had been a *de facto* taking to the entire property, we stated:

> Recognizing, as we do, that the Commonwealth is required to publicize and hold hearings in advance of the initiation of formal condemnation proceedings, we believe that when these hearings and this publicity cause the owner of a property to lose tenants to such an extent that the property no longer generates sufficient income to pay the taxes, which, in turn, leads to a threat-

ened loss of the property, that property owner has a right to the appointment of viewers to award it compensation for its property. To hold that a property owner in such circumstances has no such remedy would be to deprive that property owner of his property without due process of law.

*Id.* at 151, 412 A.2d at 217.

In *Conroy-Prugh*, 456 Pa. 384, 321 A.2d 598 (1974), our Supreme Court held that a *de facto* taking had occurred pursuant to Section 502(e). In that case, DOT had submitted various plans for the extension of a proposed highway and construction of an interchange. DOT had publicized its intent to build the highway and interchange and each of the alternative plans involved a total taking of appellant's property. As a result, appellant began losing tenants at its industrial buildings located on the property so that rentals did not cover taxes and operating expenses. Finally, the property was listed for tax sale.

The Supreme Court held in *Conroy-Prugh* that Section 604 of the Code would not help the owner in this instance because it stood to lose its property prior to formal condemnation. The Court recognized that the Commonwealth is required to hold hearings prior to initiating formal condemnation proceedings but held that a *de facto* taking occurs when the publicity causes the property owner to lose tenants so that the property no longer generates enough income to pay the taxes, which in turn, leads to a threatened loss of the property.

In *Conroy-Prugh*, the Supreme Court also noted that loss of tenants rendered the property useless for its highest and best use as commercial property. Similarly, in *Standard Investments Corp. v. Department of Transportation*, 28 Pa. D. & C. 3d 294 (1982), *aff'd on opinion of trial court, sub nom, Department of Transportation v.*

*Standard Investments Corp.*, 80 Pa. Commonwealth Ct. 649, 472 A.2d 282 (1984), *aff'd per curiam,* 506 Pa. 337, 485 A.2d 392 (1984), a *de facto* taking was found to have taken place where DOT had filed proposed plans showing acquisition of 2.578 acres of a four acre parcel for a proposed bypass. DOT had notified the property owner that the property would be appraised, surrounding properties were condemned, and the road was constructed to the property line. Further, there was a considerable amount of publicity concerning the proposed bypass. The Court held that the property could not be used for its highest and best use which was high-cost residential development since it abutted the highway and lay in its path and therefore a *de facto* taking had occurred.

In *Peter Roberts Enterprises, Inc. v. Department of Transportation,* 31 Pa. Commonwealth Ct. 479, 376 A.2d 1028 (1977), we found a *de facto* taking of a 31-acre unimproved tract. The property owner had purchased the property in 1968 intending to develop it for residential use. In 1967, DOT began preliminary design on a proposed highway. In 1968, the owner was informed by officials of Townamencin Township and the Montgomery County Planning Commission that the entire parcel could not be developed because it would be divided by the highway. Although the property could not be developed, the mortgage remained outstanding and the owner faced foreclosure. Therefore, we held that as in *Conroy-Prugh*, Section 604 of the Code would not help the owner because he could potentially lose the property prior to condemnation.

The trial court quoted the following discussion of elements required for a *de facto* taking in our decision in *Filbert* at 630, 441 A.2d at 1357:

> An ascertainable legal pattern emerges when Conroy-Prugh and Peter Roberts, on the one

hand, are compared with Commonwealth Appeal and its decisional progeny. That pattern, translated into a working principle, may be stated thus: Where a property is designated for formal condemnation pursuant to a planned, prospective public improvement, adverse interim consequences caused to the property by the prospect of condemnation will not constitute a de facto taking unless those interim consequences are that the owner is deprived of the use and enjoyment of the property, or is subjected to the loss of the property before formal condemnation can provide compensation. If there has been such an interim deprivation of use, or exposure to loss, then the principle of de facto taking becomes applicable to accelerate the time when the governmental authority must make compensation.

The beneficial use of a property includes not only its present use but all potential uses including its highest and best use. *Visco v. Department of Transportation*, 92 Pa. Commonwealth Ct. 102, 498 A.2d 984 (1985). The property owner bears the burden of proving that the property is adaptable for a use other than its current use and that there is a need for this other use. *Shillito v. Metropolitan Edison Co.*, 434 Pa. 172, 252 A.2d 650 (1969). There is substantial record evidence to support the trial court's determination that the highest and best use of Gaughen's property was as a PRD and that there was a need in the community for such a development for senior citizens.

We agree with the trial court that the publicity concerning the imminent condemnation of Gaughen's property, DOT's repeated efforts to delay subdivision in the corridor and DOT's interference in Gaughen's attempt to obtain financing substantially deprived Gaughen of the beneficial use and enjoyment of his property within the

corridor. Not only was Gaughen unable to obtain financing but he was forced to redesign his PRD without the 59 acres within the corridor. Further, he would not be reimbursed for the various costs incurred in designing the PRD by way of Section 604 of the Code.

DOT maintains that its December 2, 1986 letter to the Redevelopment Authority was a legitimate response to a request for public comment on the proposed subdivision. We do not mean to hamper DOT's ability to inform local officials or entities, such as redevelopment authorities, of legitimate environmental concerns. However, where such actions on their own or in combination with other factors deprive an owner of the use and enjoyment of his property or lead to a situation where foreclosure or a tax sale is imminent, such actions may result in a *de facto* taking.

Here, DOT raised the noise issue in a letter to the Redevelopment Authority after unsuccessfully attempting to delay subdivision within the corridor and prior to having formally picked a final route. DOT's district engineer testified that a final route would have to be chosen and an actual design known before a noise impact study could be performed. Further, DOT had assured the Township commissioners that it would design the road in such a way as to minimize noise and would also employ various noise deadening devices. Charles Kimberling, the Township manager/secretary, testified that, in 1986, the Township commissioners and Planning Commission were considering other subdivisions in the vicinity of the corridor and that at none of the hearings held with regard to these proposed subdivisions, did DOT notify the Township that noise from the proposed highway might be a problem and that developers would have to incorporate some type of noise deadening mechanisms into their building designs. Lastly, DOT's chief liaison engineer for

District 8-0, who helped to draft the December 2, 1986 letter to the Authority, testified that he did not even know the distance between the center line of the proposed highway and Gaughen's four-story apartment building planned for Phase 1, although he admitted distance is a factor in determining noise impact.

DOT's actions in forwarding the letter to the Authority were therefore most likely an attempt to delay development of property which it was going to condemn in order to significantly reduce the amount of damages at the time of formal condemnation.[13]

We disagree with DOT's argument that the trial court improperly focused on its behavior in determining that a partial *de facto* taking had occurred. The trial court properly focused on the effect that DOT's actions had on Gaughen's ability to develop his property within the corridor.

The trial court correctly held that there was a partial *de facto* taking of that portion of the tract that lay within the corridor. Although DOT did not finalize its choice of alignment for the proposed connector route until the summer of 1987, the proposed corridor for which protective buying was eventually imposed, was on the Township's zoning map. Further, on November 20, 1986, DOT filed an authorization plan notifying Gaughen of its intent to condemn the 59 acres of his tract which lay within that particular corridor. Therefore, at the time Gaughen filed its Petition for Appointment of a Board of Viewers, it was known that DOT would institute protective buying for the 59 acres within the corridor. Obviously, Gaughen knew at that time that he would have to

---

[13] Plaintiff's Exhibit 25 to trial court hearing is a DOT study report which estimates the cost of purchasing the right-of-way prior to approval of subdivision plans as $3,750,000.00, after approval of subdivision plans as $5,000,000.00, and after subdivisions are developed as $15,000,000.00.

revise his PRD and could not *use* his property within the corridor.

DOT maintains that the trial court erred in finding a partial *de facto* taking as Gaughen's Petition for Appointment of Viewers alleged an entire taking. However, DOT's position below and in its cross-appeal is that no *de facto* taking occurred and therefore, we fail to see how DOT was prejudiced by the trial court's conclusion that only a partial *de facto* taking had occurred.

Although we hold that there was a *de facto* taking of that portion of Gaughen's property which was located within the corridor, we do not accept Gaughen's argument that there was a *de facto* taking of the entire tract. We have refused to find a *de facto* taking of the entire property used for single-family residences where, as here, DOT had informed the property owners that it intended to condemn a small portion of their property for highway projects. *Department of Transportation v. Steppler*, 114 Pa. Commonwealth Ct. 300, 542 A.2d 175 (1988); *Department of Transportation v. Smoluk*, 100 Pa. Commonwealth Ct. 422, 514 A.2d 1000 (1986), *aff'd per curiam*, 517 Pa. 309, 535 A.2d 1051 (1988); *Department of Transportation v. Kemp*, 100 Pa. Commonwealth Ct. 436, 515 A.2d 68 (1986), *aff'd per curiam*, 517 Pa. 309, 535 A.2d 1051 (1988). In each of these cases, the owners continued to reside in their homes on the property; and therefore, there was no deprivation of the properties' highest and best use.

The burden of proving a *de facto* taking lies with the property owner. Gaughen contends that he has shown a taking of the entire 226.778 acres and that he could not plan another PRD because DOT did not choose a final alignment of the connector route by December of 1986. However, Gaughen was aware that protective buying was to take place within the corridor shown on the Township

zoning map and it would not have been unreasonable for him to attempt to redesign the PRD in order to work around the corridor. Gaughen admits in his brief that the effect of the highway corridor was to require him to redesign and re-engineer the PRD and once again submit a plan to the Township. Although admittedly the original PRD was a carefully integrated design, a close reading of the record reveals no evidence to show that an alternative PRD could not possibly have been developed without using the property in the corridor.

James Daylor, an appraiser testifying as an expert witness, testified that the entire property would be salable for residential use in December of 1986 and that there was a high demand for housing in the area. Further, a Township Commissioner testified that it was possible that a PRD minus the 59 acres could be approved.

Charles Kimberling, the Township manager/secretary, testified as to the locations of the detention ponds on the proposed PRD and that he thought the highway would interfere with the natural drainage of the property. However, Mr. Kimberling was not qualified as an expert witness. All in all, it was not shown that Gaughen could not develop the remaining portion of the tract as a PRD.

Gaughen expended over $286,000.00 for engineering studies, architectural plans, a market analysis, and feasibility studies related to financing the project. Since a partial *de facto* taking has been found, Gaughen may recover that portion of these expenses and attorneys' fees which may be attributed to that portion of property found to have been taken.

We realize that the original PRD plan was submitted as an integrated whole and that as a result of the partial *de facto* taking, if Gaughen wishes to reapply, he must attempt to redesign a new PRD. However, some of the prior studies and analyses may not need to be repeated

for a second design; and therefore, not all of the funds expended may be recoverable pursuant to Section 609 of the Code. However, the precise amount recoverable is premature at this time and should be determined as part of the viewers' report filed in compliance with Section 511 of the Code.[14] *See Airportels, Inc. Appeal,* 59 Pa. Commonwealth Ct. 86, 428 A.2d 1026 (1981).

We next address Gaughen's contention that the trial court erred by allowing testimony that DOT paid $2,050,000.00 for the 59 acres on September 15, 1987 and by making a finding that this was the case. Although what was paid by DOT was indeed included in a finding by the trial judge, this finding was not treated by the Court as a factor influencing its determinations. Whether or not it was relevant is of no moment and its mention is harmless.

In sum, we hold that a *de facto* taking of 59.235 acres of Gaughen's property located within the corridor occurred on December 29, 1986. Gaughen failed to prove a *de facto* taking to the entire tract as there is no record evidence to show that he is precluded from utilizing the remaining acreage to redesign a new PRD. Accordingly, we will affirm the trial court's order.

## ORDER

AND NOW, this 23rd day of February, 1989, the order of the Cumberland County Court of Common Pleas dated December 31, 1987, at Nos. 1172 Civil 1987 and 1328 Civil 1987, is affirmed.

---

[14] 26 P.S. §1-511.