# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Nancy O. Brown              :
                                          :    No. 235 C.D. 2018
       v.                      :    Argued: December 11, 2018
                                            :
Pennsylvania Turnpike Commission,   :
                  Appellant     :

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**                    **FILED: January 7, 2019**

        In this eminent domain case involving an alleged *de facto* taking by stormwater discharge, the Pennsylvania Turnpike Commission (Condemnor) appeals an order of the Court of Common Pleas of Montgomery County[1] (trial court) that overruled Condemnor's preliminary objections to Dr. Nancy O. Brown's (Condemnee) petition for appointment of a board of viewers under Section 502(c) of the Eminent Domain Code (Code), 26 Pa. C.S. §502(c). The trial court determined that Condemnor condemned, by means of a permanent stormwater easement, the rear undeveloped portion of Condemnee's property located at 2303 Hickory Road, Plymouth Meeting, Pennsylvania, and that the date of the *de facto* taking was August 6, 2014, and it directed the appointed board of viewers to conduct a hearing to determine just compensation or other damages under the Code. Upon review, we affirm.

---

[1] The Honorable Carolyn Tornetta Carluccio presided.

## I. Background

## A. Generally

Condemnee owns and operates Hickory Veterinary Hospital, a large veterinary hospital located on Hickory Road near the intersection of the Pennsylvania Turnpike and its Northeast Extension (collectively, the Turnpike). The hospital is a 24-hour, full-service, small-animal hospital offering a wide range of veterinary services. In 2012-14, Condemnor began a project to widen 10 miles of the Turnpike, including the portion that abuts Condemnee's property. As a result of the widening project, Condemnee's property is now bounded to the west by the Turnpike and a retaining wall.

Condemnee's property is shaped like a hockey stick adjacent to the Turnpike. See Expert Report of Gregory C. Newell, P.E. (Newell Report), 7/12/17, Ex. No. 1; Supplemental Reproduced Record (S.R.R.) at 370a. The hospital is located in the developed area at the northern end of the handle of the stick. Toward the upper portion of the stick is an auxiliary gravel parking area. Id.

The undeveloped area below and south of the gravel parking area is the area affected by increased and now concentrated stormwater discharge from the Turnpike. This area is undeveloped, consisting of brush and other vegetation. The affected area is bounded to the west by the Turnpike retaining wall and to the east by Plymouth Creek.

Below and to the south of the affected area is the rear of the property, which extends in an easterly direction. Condemnee intends to expand her

2

veterinary facilities by constructing a canine rehabilitation facility (rehab facility) on this part of her property. Plymouth Creek ultimately crosses this part of the property.

In order to reach the planned rehab facility from the existing hospital, a driveway would need to be constructed from the developed area through the affected area to reach the rear of the property. Although not relevant to the stormwater discharge problems at issue in this case, the proposed driveway must also cross Plymouth Creek.

Condemnor's construction project significantly changed the grade of the Turnpike. The widening of the roadway increased the stormwater flow, which necessitated the construction of 10 water detention basins along the Turnpike to keep the water flow at pre-construction levels.

However, Condemnor did not place a water detention basin in the area of the project abutting Condemnee's property. Rather, Condemnor constructed a riprap swale (a stone-filled U-shaped channel) to collect stormwater runoff from three pipes running under the retaining wall and then discharge the runoff from the swale directly into the affected area of Condemnee's property. By Condemnor's own calculations, the post-construction stormwater flow onto Condemnee's property from the Turnpike increased by 500%.

**B. Temporary Construction Easement; *De Jure* Taking**

In a separate proceeding between the parties before a different trial judge, Condemnor formally condemned a temporary construction easement to build a temporary erosion and sedimentation basin on Condemnee's property to contain sediment and runoff from the construction project. At the conclusion of the project, Condemnor removed the sedimentation basin, restored the property and vacated the temporary construction easement.

Following a week-long trial in June 2017, a jury awarded Condemnee compensation for the *de jure* taking. In that proceeding, the parties resolved all damage issues regarding the construction easement.

**C. Petition for Appointment of Board of Viewers**

Meanwhile, in January 2017, Condemnee filed a petition for appointment of a board of viewers alleging the *de facto* condemnation of a permanent easement as a result of the increased stormwater discharge. Condemnee sought damages related to the alleged *de facto* taking, including consequential damages under Section 714 of the Code, 26 Pa. C.S. §714. The trial court granted Condemnee's petition and appointed a board of viewers to determine compensation and other damages.

In response, Condemnor filed preliminary objections alleging noncompliance with the requirements of Section 502(a) of the Code, 26 Pa. C.S. §502(a), waiver, and statute of limitations.

### D. Hearing on Preliminary Objections

In July 2017, the month following the jury trial on the *de jure* temporary taking, the trial court held a hearing on Condemnor's preliminary objections to the petition alleging a *de facto* taking. See Tr. Ct. Hr'g, 7/17/17, at 1-132; Reproduced Record (R.R.) at 154a-285a. In its opinion in support of its order overruling Condemnor's preliminary objections, the trial court noted that it accepted Condemnee's testimony as credible. Condemnee owns and runs the Hickory Veterinary Hospital on her property. She purchased the property in 1983. Condemnee testified that prior to the Turnpike widening project, the rear of her property, where she planned to build the rehab facility, did not flood. However, after Condemnor completed the project, the rear of her property floods even during modest rainfalls. Condemnee further testified that prior to the project, there was one feasible spot to build an access road to the rear of her property. However, after the project and continuous flooding that resulted, it was no longer feasible to construct the access road.

Condemnee testified that the flooding interferes with her access to the rear of the property and her use and enjoyment of the property because she planned to expand her practice to include the rehab facility. In addition, the flooding is damaging the surface support of her property through erosion, destruction of plant life, and the creation of storm water tributaries arising from the paths of the water flow. In particular, the stormwater erosion directly crosses the area where Condemnee planned to construct the access road to the rear of her property. See Newell Report, Exs. Nos. 3, 4, 13; S.R.R. at 372a, 373a, 378a.

5

The trial court also found the expert report[2] of Condemnee's engineering expert, Gregory C. Newell, P.E. (Engineer), to be very credible. Engineer's report explained that the swale discharge, 650 feet south of Hickory Road, is a concentrated discharge located right at Condemnee's property line. Stormwater enters Condemnee's property from the swale and flows south parallel to the property line with the Turnpike to an area where a small pre-project pipe also discharges onto the property. See Newell Report, Ex. No. 3; S.R.R. at 372a.

The combined discharge from the large swale and the smaller pre-project pipe flows east/southeast across Condemnee's property to a tributary. See Newell Report, Ex. No. 4; S.R.R. at 373a. During a storm, the combined swale/pipe discharge constitutes more than a 500% increase over the pre-project pipe discharge.

Near the end of project construction, Condemnor removed a temporary erosion and sedimentation basin it constructed on Condemnee's property pursuant to a temporary construction easement. Condemnor also graded and lined the swale to its permanent condition. On this date, August 14, 2014, the unmitigated stormwater discharges from the swale began. This resulted in the creation of a continuous and permanent flooding condition on Condemnee's property.

---

[2] See Expert Report of Gregory C. Newell, P.E. (Newell Report), 7/12/17, 1-71, Reproduced Record (R.R.) at 287a-357a; see also Exhibits from Newell Report, Supplemental Reproduced Record (S.R.R.) at 370a-75a.

The trial court also accepted Engineer's testimony as persuasive. Engineer testified that *before* the project, stormwater flowed onto Condemnee's property and dispersed in heavy brush, weeds and briers. Nothing concentrated the water flow or created a defined channel. As a result, at that time stormwater had little or no impact on Condemnee's property.

Condemnor's project *increased the volume* of stormwater discharge by 500% and *concentrated the discharge* at a specific point. Flooding and erosion began to occur with even the smallest storms. A clear erosion channel now exists.

Engineer further testified that the increased stormwater flows interfere with safe access to the rear of Condemnee's property. The concentrated flow would come barreling down the only feasible access road at a very high velocity and cause significant damage to any development on the rear property. Engineer testified this flooding is a *permanent* condition resulting from Condemnor's widening project. Engineer also testified that as a result of steep slopes and a nearby stream, there is no feasible way to construct an access road to the rear of the property other than in the area depicted in Exhibit No. 13 of his expert report. See Newell Report, Ex. No. 13; S.R.R. at 378a.

Condemnee and Engineer also persuaded the trial court that Condemnee was planning the construction of the proposed rehab facility on the rear of her property in response to the ongoing expansion of her veterinary practice. Condemnee employs 19 veterinarians, 4 surgeons and 94 staff members.

Condemnee further testified that she expanded the hospital six times. The hospital has approximately 18,000 active patient files and operates a 24/7 emergency clinic.

Condemnee also testified there is a strong demand for a larger canine rehab facility in the area, and there is no such facility within a 30-mile radius of the hospital. The hospital's current one-room rehab center is much too small and can accommodate only one patient at a time. The proposed rehab facility would be able to treat multiple patients at one time and would have a pool and an underwater treadmill.

In addition, Engineer testified that Condemnee planned to build the new rehab facility long before the Turnpike project began. In particular, Condemnee and Engineer began working on the plan before the Turnpike project started. Engineer further opined, as someone experienced in land development, that Condemnee would have been able to obtain all the permits and approvals necessary to construct the rehab facility.

### E. Overruling of Preliminary Objections

In January 2018, the trial court filed an order overruling Condemnor's preliminary objections. The trial court determined that Condemnor "*de facto* condemned, via a permanent stormwater easement, the rear undeveloped portion of Condemnee's property …." Tr. Ct. Order, 1/24/18, ¶2. The trial court also directed the appointed board of viewers to conduct a hearing to determine just compensation and consequential damages. Id., ¶4.

8

## F. Condemnor's Appeal; Statement of Errors

Condemnor filed a notice of appeal. The trial court issued an order directing Condemnor to file a Concise Statement of Errors Complained of on Appeal. R.R. at 146a. Condemnor complied, alleging: Condemnee introduced no evidence of any legitimate issue as to lateral or surface support; Condemnee introduced inadequate evidence of erosion or other impact to her property; Condemnee introduced no evidence of any restriction on her ability to make use of her property as a result of Condemnor's activities; Condemnee introduced no evidence that any proposed rehab facility would ever be constructed on the rear of her property, or that any use at all would be made of the woodlands allegedly affected by Condemnor's construction activities; Condemnee introduced no evidence of any market need for the proposed rehab facility; to the extent Condemnee established occasional flooding, this does not establish a *de facto* taking as a matter of law; and in the absence of any actual utilization of the property in question, there can be no compensable interference with the use of that property. R.R. at 150a-51a.

## G. Trial Court's Opinion in Support of Order

In its opinion in support of its order, the trial court noted that Condemnor did not obtain its own expert or present any witnesses to counter Condemnee's testimony and Engineer's report and testimony. Rather, Condemnor relied solely on its cross-examination of Engineer. See N.T. at 74-91; R.R. at 227a-44a. However, the trial court found Condemnor's cross-examination unpersuasive and ineffective. Tr. Ct., Slip Op., 5/23/18, at 20.

In addressing Condemnor's assignment of errors, the trial court explained that it never determined the flooding at issue was occasional or sporadic. Rather, based on the evidence, including videos and testimony from Condemnee and Engineer, the trial court determined the flooding at issue was continuous and permanent. Id. at 21.

The trial court also rejected Condemnor's allegation that Condemnee presented no evidence that she would have actually built a rehab facility on the rear of the property. To the contrary, the trial court indicated that plans for the rehab facility existed prior to the construction project and revealed Condemnee needed to build the new rehab facility given the limited rehab facility currently in use. Id. In particular, the trial court explained that Condemnee's history of expanding the veterinary hospital in stages, with the proper approvals, weighed in favor of a finding that construction of the new rehab facility was not speculative. Id. Condemnor appeals.[3]

## II. Issues

Condemnor presents three issues for our review. First, Condemnor contends the trial court erred in finding a *de facto* taking occurred where there is no dispute that the area in question is entirely undeveloped at present and therefore any stormwater discharge does not impact Condemnee's existing operations.

_____

[3] Our review of a trial court's order overruling or sustaining preliminary objections to a petition for appointment of a board of viewers is limited to determining whether the trial court's findings of fact were supported by substantial evidence and whether the trial court committed an error of law or an abuse of discretion. Colombari v. Port Auth. of Allegheny Cty., 951 A.2d 409 (Pa. Cmwlth. 2008).

Second, Condemnor asserts the trial court erred in finding a *de facto* taking occurred because Condemnee did not establish any present plans or intent to develop the rear of the property in any respect. Third, Condemnor argues the trial court erred in finding a *de facto* taking occurred where Engineer testified there were engineering solutions available as part of the construction of any hypothetical access road that may be constructed to serve any hypothetical canine rehab facility located on the rear portion of the property.

### III. Discussion
### A. Taking of Undeveloped Property
### 1. Argument

Condemnor contends that its discharge of stormwater across an undeveloped, wooded section of Condemnee's property did not result in a *de facto* taking. Here, the area in question lies to the south of Condemnee's auxiliary gravel parking lot, which is located to the south of the hospital complex. Condemnor asserts this is raw, undeveloped land. The only use to which this land has ever been put was for Condemnor's temporary construction easement and sedimentation basin. Following completion of its five-year construction project, Condemnor removed the sediment trap and restored the property to its previous condition. See N.T. at 51; R.R. at 204a.

Consequently, even assuming the stormwater discharge is greater than it was pre-construction, Condemnor argues there is absolutely no evidence that the post-construction discharge causes Condemnee any meaningful or compensable damage or harm at the present time. Condemnor asserts our decision in McMaster

11

v. Township of Bensalem, 161 A.3d 1031 (Pa. Cmwlth. 2017), is controlling. In McMaster, the property owners alleged that the township, through its construction activities, flooded an undeveloped portion of their property near their residence. All the flooding in McMaster occurred in a wooded area that the owners partially cleared for such things as a horseshoe set-up for a picnic, mini-bike riding and a tree fort for their children. The owners did not view this property as part of their lawn. The trial court sustained the township's preliminary objections. It determined the flooding did not constitute a *de facto* taking because the flooding did not substantially deprive the owner of the use and enjoyment of the property.

The flooding in McMaster did not interfere with the property owners' preexisting use of their house or lawn. The owners did not show that they used the wooded area in any way that the flooding affected. Absent any showing of interference with the use of the flooded, wooded property, the trial court concluded that the owners failed to establish that the township's stormwater redirection established a *de facto* taking. Id.

Ultimately, this Court affirmed. Although the township diverted water from its natural channel and caused substantial and recurring flooding on a part of the owners' property, we determined that neither the nature of the township's conduct nor the damage to property rose to the level of a *de facto* taking. We also observed that the discharge onto the owners' property resulted from the township's negligence rather than an intentional discharge, and that the flooding was ultimately abated.

12

Specifically, this Court reasoned (with emphasis added):

> The [t]ownship's flooding did not interfere with [owners'] use of their house or lawn. [Owners] did not show that they actually used the wooded area of the [p]roperty in any way that was affected by the flooding <u>or that the flooding prevented any development of that area that would have otherwise been likely to occur.</u> [Owners] showed only some sporadic use of the cleared area that may have been affected by the flooding and some damage to trees from the flooding. <u>In addition, the fact that the 2010 pipe installation solved the flooding showed that the flooding was abatable and preventable, although this remediation was something that only the [t]ownship could do</u>.

McMaster, 161 A.3d at 1037. Condemnor asserts McMaster is nearly on all fours with the present case and is therefore controlling. As such, Condemnor argues the trial court erred in finding a *de facto* taking occurred.

## 2. Analysis

In order to establish a *de facto* taking, a property owner must show: (1) the condemnor has the power to condemn land under eminent domain procedures; (2) exceptional circumstances have substantially deprived her of the use and enjoyment of her property; and (3) the damages sustained were the immediate, necessary and unavoidable consequences of the exercise of eminent domain. In re: Mountaintop Area Joint Sanitary Auth., 166 A.3d 553 (Pa. Cmwlth. 2017). Here, the trial court noted the first element was not at issue. Clearly, Condemnor possesses the power to condemn the property at issue under eminent domain procedures. Second, the trial court determined Condemnee presented ample evidence that the flooding at issue substantially deprived her of the use of

13

her property. Third, the trial court determined that the damages sustained were the immediate, necessary and unavoidable consequences of the exercise of eminent domain power.

Where the evidence shows the flooding of land is the direct result of a condemnor's drainage plan, a *de facto* taking is established. Greger v. Canton Twp., 399 A.2d 138 (Pa. Cmwlth. 1979) (citing Hereda v. L. Burrell Twp., 48 A.2d 83 (Pa. 1946)). In Hereda, the township constructed a drainage pipe under a street, which immediately began flooding the plaintiffs' property and frequently resulted in the need for the plaintiffs to pump water from their basement of their home. Prior to the installation of the drainage pipe, the plaintiffs were unaffected by water or drainage from the street.

In Hereda, the Supreme Court reasoned that the township's drainage plan resulted in injury to the plaintiffs' property. The plan accumulated and directed water and sewage from the street into an artificial conduit and then discharged it in volume onto plaintiffs' property. The Hereda Court noted that such injury was the direct, immediate, necessary and unavoidable consequence of the exercise of the township's conferred power and the township's action in implementing its drainage plan.

Here, the record supports the trial court's finding of a *de facto* taking. Condemnee testified that prior to the construction project, the rear of her property did not flood. After Condemnor completed the construction project, the rear of Condemnee's property would flood during even modest rainfalls. In addition,

14

Condemnee testified that prior to the project, there was one feasible area to build an access road to the rear of her property where she planned to construct the rehab facility. However, because of post-project flooding, the proposed access road is no longer feasible. See N.T. at 113-18; R.R. at 266a-71a.

Condemnee further testified she needs to have access to her entire property as part of her planned expansion of her veterinary facilities and in case she would need to sell the property, including the veterinary facilities. Id. On *voir dire* examination, Condemnee qualified as an expert in veterinary medicine. N.T. at 95-101; R.R. at 248a-54a.

On direct examination, Condemnee testified that her hospital's survival will be *contingent on developing new strategies to meet the expectations of pet owners for* the best care available. N.T. at 103; R.R. at 256a. This includes the need to develop the rear of the property as a new rehab facility with an access driveway, a drop off and parking area, a treatment building, a caretaker's apartment and play/walking areas. Id. The current rehab facility consists of only one room where only one patient can be treated at a time. N.T. at 107; R.R. at 260a; see also Expert Report of Nancy O. Brown, V.M.D., 7/13/17 (Brown Report), Ex. A ("Need to Provide Canine Rehabilitation Services In the Rear of the Hickory Veterinary Hospital"); S.R.R. at 369a. Condemnee testified she could triple or quadruple the number of patients in rehab. N.T. at 107; R.R. at 260a.

The trial court also found Engineer's testimony to be "extremely persuasive" that there was a taking of Condemnee's property. Tr. Ct., Slip Op., at

15

12. Engineer testified that prior to the construction, the stormwater coming off the Turnpike was not an obstacle to development of the access road. N.T. at 22-23; R.R. at 175a-76a. The water flowed through heavy brush, weeds and briers, where it dispersed. N.T. at 23; R.R. at 176a. It had little or no impact on the property, and there were no obvious signs of erosion or disruption of the property. Id. As such, Engineer opined the stormwater flow prior to the Turnpike project would not have impacted the proposed driveway. Id.

However, the Turnpike construction widened the paved area and added a third travel lane in both directions. N.T. at 24; R.R. at 177a. The project also raised the elevation of the Turnpike and installed a retaining wall and extensive storm drainage facilities, including a number of drainage pipes and a well-defined riprap swale. Id. Engineer explained that the Turnpike was much higher than Condemnee's property prior to the project construction and the grass area sloped down toward the property line. It had roughly 40 to 50 feet to make up a grade difference. N.T. at 26; R.R. at 179a. Therefore, when Condemnor widened the roadway, it eliminated most of the grass area and added fill to build the new roadway at the Turnpike level. Id. Condemnor constructed a large retaining wall to support the added fill. Id.

To remove the stormwater from the roadway, Condemnor added additional drainage pipes through the retaining wall that discharged into the U-shaped riprap swale. N.T. at 28; R.R. at 181a. Eventually, the swale discharges the stormwater directly onto Condemnee's property at one specific point. N.T. at 29-30; R.R. at 182a-83a. Condemnor made no effort to disperse water at the point

16

of discharge.  Id.  As a result, there was a 500% increase in stormwater discharge onto the property, which is highly concentrated at one point.  N.T. at 31; R.R. at 184a.

Engineer further testified that as a result of the design of the swale discharge, the stormwater will flow over the area where Condemnee planned to build the access road.  N.T. at 32-43; R.R. at 185a-96a.  The concentrated water flow would erode the surface support and destabilize the area, therefore interfering with the design, construction and maintenance of the access road.  Id.  Engineer further testified Condemnee could not build the access road anywhere else.  N.T. at 44; R.R. at 197a.

The evidence cited above supports the trial court's determination that Condemnee established the flooding caused by Condemnor's construction project substantially deprived her of the use of her property by significantly restricting and interfering with her ability to access and develop the rear of property, where she intended to expand her veterinary facility to include a canine rehab facility.  The evidence also supports the trial court's determination that the damages Condemnee sustained were the immediate, necessary and unavoidable consequences of Condemnor's construction project, which *intentionally* diverted a greatly *increased* and *concentrated* stormwater flow directly onto Condemnee's property.  As such Condemnee's evidence, found credible by the trial court, established a *de facto* taking of the rear portion of Condemnee's property.  Hereda.

17

In addition, we reject Condemnor's argument that our decision in McMaster is controlling here, for the following reasons. To the contrary, we conclude the circumstances in McMaster are significantly distinguishable from those in the present case. In determining whether a *de facto* taking occurred, each case turns on its own facts. In re: Borough of Blakely, 25 A.3d 458 (Pa. Cmwlth. 2011).

First, in McMaster, the trial court did not find a *de facto* taking where the stormwater discharged onto a residential property and did not interfere with the owners' use of their house or lawn. Although the flooding in McMaster also occurred in a wooded area, the owners did not show they actually made significant use of the wooded area *or that the flooding prevented any development of that area that otherwise would have been likely to occur*. In the current case, however, there was significant evidence of the likely development of the flooded area. This point will be discussed further below.

Second, when the township in McMaster initially redirected the stormwater flow in 1988 or 1989, it mistakenly believed the stormwater flowed into a bordering creek. The township never intended to discharge the stormwater onto the owners' property.

In the present case, however, Condemnor's construction project created a drainage system that *intentionally* discharged a greatly increased and concentrated flow of stormwater onto the rear of Condemnee's property.

18

Condemnee testified that a normal rainfall is now sufficient to cause flooding. N.T. at 116; R.R. at 269a.

Third, in McMaster, the flooding was actually abated. In particular, the township installed a new pipe in 2010 that resolved the flooding problem. Here, however, the flooding is not abated, no specific plans for abatement were presented, and there is expert testimony and a finding from the trial court that the condition is permanent. This point will be discussed below.

In sum, given the factual differences between McMaster and the present case, we reject Condemnor's contention that McMaster is controlling.

## B. Intention to Develop Property

### 1. Argument

Condemnor next contends the trial court erred in finding a *de facto* taking occurred because Condemnee did not establish any present plans or intent to develop the rear of the property in any respect. Condemnor asserts that during the jury trial on the *de jure* taking for the temporary construction easement, Condemnee alleged the stormwater issues precluded her development of the rehab facility. However, Engineer conceded both in the *de jure* trial and the present trial that nobody obtained, or even applied for, any permits for the construction of the rehab facility.

Further, Condemnee testified that a need for the rehab facility existed based on demographic studies she commissioned in 1991, regarding the need for

19

the rehab facility.  See N.T. at 104-06; R.R. at 257a-59a.  Condemnee admitted she did not update the studies.  N.T. at 106; R.R. at 259a.  The trial court struck any reference to the study as untimely.  Id.

Summarizing, Condemnor points out that in both the *de jure* jury trial and the present bench trial, Condemnee and Engineer conceded that she took no actual steps to pursue the rehab facility.  As such, the area of Condemnee's property at issue remains undeveloped.  Therefore, in accord with McMaster, the discharge of stormwater onto raw, undeveloped land cannot be considered a *de facto* taking.

## 2. Analysis

In its opinion, the trial court rejected Condemnor's contention that the record contained no evidence showing that a canine rehab facility would ever have been built on Condemnee's property or that there is a market need for the same. Tr. Ct., Slip Op., at 21.  To the contrary, the trial court noted:

> the record demonstrates that plans for such a facility had been in place long before the Turnpike Project, and that, [Condemnee] needed to build such a canine rehab facility given her limited physical space to rehab all of her patients.  In addition, [Condemnee's] history of expanding the Veterinary Hospital in stages, and history of obtaining the necessary variances, all weighed in a finding that the eventual construction of such a facility was not speculative.

Id.

20

The beneficial use of a property includes not only its present use but all potential uses, including its highest and best use. Gaughen v. Dep't of Transp., 554 A.2d 1008 (Pa. Cmwlth. 1989) (citing Visco v. Dep't of Transp., 498 A.2d 984 (Pa. Cmwlth. 1985)). The property owner bears the burden of proving that the property is adaptable for a use other than its current use, and that there is a need for this other use. Id. (citing Shillito v. Metro. Edison Co., 252 A.2d 650 (Pa. 1969)). At the preliminary objection stage of a *de facto* taking case, evidence of highest and best use is relevant to the issue of whether a *de facto* taking occurred, that is, whether the condemnee's property was so affected that the condemnee was deprived of the beneficial use and enjoyment of the property's highest and best use. Appeal of Dep't of Transp., 605 A.2d 1286 (Pa. Cmwlth. 1992).

Here, Condemnee sought to establish not an entirely different use, but rather a more intensified version of the current professional use. She testified as to her long-standing plans for expansion and the need for such expansion. See Brown Report, Ex. A ("Need to Provide Canine Rehabilitation Services In the Rear of the Hickory Veterinary Hospital"); S.R.R. at 369a ("A rehab center is needed for Hickory Veterinary Hospital to achieve its highest and best use as a modern full-service veterinary facility."). Engineer also testified as to the long-standing plans for such expansion and the adaptability for such expansion. The trial court accepted this evidence.

More specifically, regardless of the stricken 1991 demographic studies, the trial court noted that both Condemnee and Engineer provided persuasive testimony that Condemnee planned to construct the proposed rehab

21

facility in response to the ongoing expansion of her veterinary practice. Condemnee explained that the hospital has about 18,000 active files. N.T. at 97; R.R. at 250a. The hospital employs 19 veterinarians. Id. Previously, Condemnee expanded the veterinary facility six times. N.T. at 111; R.R. at 264a. She obtained municipal approval for every expansion. Id.

Further, Engineer testified that Condemnee began implementing her master plan 10 to 15 years ago. N.T. at 22; R.R. at 175a. The plans for the rehab facility go back to that time. Id. Condemnee proceeded in stages; she took care of the front of the property first, which involved the clinical practice. Id.

Engineer further testified Condemnee began planning construction of the access road three years ago. N.T. at 21; R.R. at 174a. Also, Engineer opined that it is highly likely that Condemnee would have been able to obtain all the permits and approvals necessary to construct the rehab facility. N.T. at 91; R.R. at 244a; see also Newell Report at 21; R.R. at 307a.

In eminent domain cases, questions concerning witness credibility and conflicts in the evidence are for the trial court to resolve. In Re: Condemnation by Beaver Falls Mun. Auth. for Penndale Water Line Extension, 960 A.2d 933 (Pa. Cmwlth. 2008). If sufficient evidence supports the trial court's findings as fact-finder, we will not disturb these findings. Id. In addition, we may not disturb a trial court's credibility determinations. Id.

22

Here, the trial court credited Condemnee's testimony and Engineer's testimony that Condemnee definitely planned to build an access road and rehab facility on the rear of the property, and that it was highly likely Condemnee would have been permitted to do so. Because the trial court's findings and credibility determinations are supported by the evidence, we may not disturb them. Beaver Falls Mun. Auth.

## C. Abatement of Stormwater Problems

### 1. Argument

Condemnor next contends the trial court erred in finding a *de facto* taking occurred where Engineer testified there were engineering solutions available as part of the construction of any hypothetical access road and canine rehab facility located on the rear of the property. Citing McMaster, Condemnor argues that a critical factor weighing against the determination of a *de facto* taking is that any harm arguably suffered by a property owner may be readily abatable. Condemnor asserts the stormwater flow could be addressed, and easily so, through engineering solutions such as a culvert. On cross-examination, Engineer acknowledged that he must design a driveway to cross Plymouth Creek, a tributary on Condemnee's property, by building a bridge over it or installing a culvert. N.T. at 85-86; R.R. at 238a-39a. Condemnor asserts that the stormwater discharge is less of an engineering challenge than crossing Plymouth Creek.

Essentially, Condemnor argues that Engineer conceded that there might be a solution to the stormwater problem that would permit driveway construction. Therefore, because the stormwater problem is readily abatable,

23

Condemnor asserts that <u>McMaster</u> supports a conclusion that no *de facto* taking occurred.

In response, Condemnee asserts Condemnor waived the issue of whether the stormwater problem is abatable by failing to raise it in its Pa. R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal. <u>See</u> R.R. at 150a-53a. Issues not included in the Concise Statement of Errors or not raised in accordance with the provisions of Rule 1925(b)(4) are waived. <u>Mountaintop Area Joint Sanitary Auth.</u>

Alternatively, Condemnee asserts Engineer could not abate the stormwater problem because the source of the stormwater problem is on Condemnor's side of the property. Moreover, Condemnor presented no evidence that Engineer could abate the stormwater problem.

In addition, Condemnee asserts Condemnor mischaracterized Engineer's testimony on cross-examination. Engineer never conceded that the stormwater problem caused by Condemnor's construction project was abatable.

Finally, Condemnee argues that even if Condemnor presented evidence that the stormwater problem could be abated, the trial court determined that the flooding issue was continuous and permanent. <u>See</u> Tr. Ct., Slip Op. at 21. Condemnee asserts this finding is supported by the evidence.

24

## 2. Analysis

We first reject Condemnee's contention that Condemnor waived the issue of whether the stormwater problem is abatable by failing to raise it in its Pa. R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal.

Rule 1925(b)(4)(v) provides that each error identified in the Concise Statement of Errors will be deemed to include every subsidiary issue contained therein that was raised in the trial court. The presence of a possible engineering solution to the stormwater problem can be a factor in evaluating whether a *de facto* taking occurred. Condemnor clearly questioned the sufficiency of proof of a *de facto* taking in its Concise Statement of Errors, and abatement is a subsidiary issue. Further, Condemnor raised the issue of whether Condemnee could abate the stormwater problem in its cross-examination of Engineer. <u>See</u> N.T. at 85-86; R.R. at 238a-39a. Because Condemnor raised the abatement issue before the trial court, and because abatement is a subsidiary issue of proof of *de facto* taking, it is properly before this Court.

Nevertheless, as the trial court observed, Condemnor presented no evidence at trial. Rather, Condemnor relied on its cross-examination of Engineer to attempt to show that Condemnee could solve the stormwater problem by herself. Condemnor argues that Engineer "readily conceded" that there is an engineering solution to the stormwater problem. <u>See</u> Appellant's Br. at 15.

We disagree. Our review of Engineer's testimony indicates that Condemnor, not Condemnee, could have lessened the damage from the stormwater

25

flow by constructing a basin on Condemnee's property. N.T. at 60-61; R.R. at 213a-14a. This would require a *de jure* taking of Condemnee's property because there is no room for it on the Turnpike side. Id. However, there would still be damages to Condemnee's property resulting from the increased amount of runoff and the concentrated discharge at a specific point. Id.

Further, the trial court found Condemnor's cross-examination of Engineer unpersuasive and ineffective in rebutting the evidence of a *de facto* taking. Tr. Ct., Slip Op., at 20. For example, Engineer recalled on cross-examination that when asked if there was an engineering solution to the drainage problems at issue, he gave no testimony concerning anything about a solution to Condemnor's decision to flood Condemnee's property. N.T. at 86; R.R. at 239a. Although Engineer indicated that he suspected there could be an engineering solution to the flooding problem, he never testified what the solution would be, what it would cost, or who would implement it. Consequently, we reject Condemnor's argument that Engineer's testimony on cross-examination was sufficient to establish that the stormwater problem was readily abatable.

In addition, Engineer testified that the flooding is continuous and permanent. N.T. at 42, 56; R.R. at 195a, 209a. The trial court accepted this as fact. Tr. Ct., Slip Op., at 21. To effectuate a taking, an overflow of water must constitute an actual, permanent invasion of the land. Colombari v. Port Auth. of Allegheny Cty., 951 A.2d 409 (Pa. Cmwlth. 2008). Because the trial court found the stormwater problem to be continuous and permanent, it cannot be considered abatable to the extent McMaster would control this case. Therefore, we reject

Condemnor's contention that it established through Engineer's testimony on cross-examination that there were engineering solutions available as part of the construction of an access road that could address and abate any stormwater problems.

## IV. Conclusion

For the above reasons, we discern no error or abuse of discretion in the trial court's determination that Condemnor *de facto* condemned, by means of a permanent stormwater easement, the rear undeveloped portion of Condemnee's property as described by the trial court in its order. Accordingly, we affirm.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Nancy O. Brown            :

                                :   No. 235 C.D. 2018

           v.              :

                                :

Pennsylvania Turnpike Commission,  :

                  Appellant   :

## **O R D E R**

**AND NOW**, this 7th day of January, 2019, for the reasons stated in the foregoing opinion, the order of the Court of Common Pleas of Montgomery County is **AFFIRMED**.

 

_____

ROBERT SIMPSON, Judge